863 F.2d 891
 129 L.R.R.M. (BNA) 2691, 130 L.R.R.M. (BNA) 2250,
274 U.S.App.D.C. 202, 57 USLW 2304,
110 Lab.Cas. P 10,762, 110 Lab.Cas. P 10,824,
110 Lab.Cas. P 10,941
 AIR LINE PILOTS ASSOCIATION, INTERNATIONAL
v.
EASTERN AIR LINES, INC., Appellant.
TRANSPORT WORKERS UNION OF AMERICA, AFL-CIO, et al.
v.
EASTERN AIR LINES, INC., Appellant
INTERNATIONAL ASSOCIATION OF MACHINISTS & AEROSPACE WORKERS,
AFL-CIO, et al.
v.
EASTERN AIR LINES, INC., Appellant Texas Air Corporation, et al.
In re EASTERN AIR LINES, INC.
 Nos. 88-7201 to 88-7204.
 United States Court of Appeals,
District of Columbia Circuit.
Argued Sept. 26, 1988.
Decided Sept. 30, 1988.
Typed Opinion Sept. 30, 1988.
Printed Opinion Oct. 28, 1988.*
Opinions on Denial of Rehearing En Banc Jan. 10, 1989.
 
 Appeal from the United States District Court for the District of Columbia and Petition for Writ of Mandamus (Civil Action Nos. 87-02002, 88-00364 and 88-00870).
 John J. Gallagher, with whom, Michael J. Madigan, Washington, D.C., and David Boies, New York City, were on the brief for appellant.
 James L. Linsey, New York City, and Joseph Guerrieri, Jr., Washington, D.C., with whom, Jonathan A. Cohen and Arthur M. Luby, Washington, D.C., were on the brief for appellees. Stephen Presser, Asher W. Schwartz, New York City, Edgar James and Richard Ruda, Washington, D.C., also entered appearances for appellees.
 James J. McDonald, Jr., and Robert J. Delucia were on the brief for amicus curiae, Airline Indus. Relations Conference, urging reversal.
 Before BUCKLEY, WILLIAMS and SENTELLE, Circuit Judges.
 Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 
 1
 On July 22, 1988 Eastern Air Lines announced that effective August 31, 1988 it would implement schedule changes that would eliminate 204 unprofitable flights per day. Because Eastern would add 61 new flights in its core markets at the same time, the net reduction in flights would be 143 per day. Eastern planned to close its Kansas City hub;[1] this decision accounted for 84% of the reduction in the aircraft hours. The other schedule changes affected the Northeast-to-Florida routes and eliminated three round-trip flights from the Philadelphia hub.
 
 
 2
 In addition, Eastern announced that it intended to furlough 3388 employees who would no longer be needed after the reduction in service. Of the employees that Eastern planned to furlough, 1050 were flight attendants represented by the Transport Workers Union of America ("TWU"); 1172 were mechanics and baggage handlers represented by the International Association of Machinists ("IAM"); and 1166 were non-union or management employees. The schedule changes also eliminated the need for 500 pilots, represented by the Air Line Pilots Association ("ALPA"), but Eastern planned to reduce its pilot force through attrition rather than through furlough, and accordingly issued no pilot furlough notices. The reduction in personnel would reduce Eastern's payroll expense by $6.9 million per month.
 
 
 3
 Eastern's announcement occurred as the company's financial condition steadily worsened. Since 1980, Eastern has lost $1 billion. Its economic plight was not alleviated by its acquisition in November 1986 by Texas Air Corporation, an airline holding company whose principal subsidiaries are now two wholly-owned carriers, Eastern and Continental Airlines. Eastern lost $194 million in 1987 (before adjustment for the sale of assets) and $120 million in the first half of 1988. In the second quarter of 1988, Eastern was losing $1 million every day. One of plaintiffs' experts estimated that in the absence of major changes, the company would continue to lose $200 to $250 million a year. Appellant's Appendix ("Appellant's App.") II-7-8 (testimony of Farrell Kupersmith). Moreover, Eastern had borrowed heavily to stay in business despite such enormous losses. As of June 30, 1988, Eastern's debt totaled $2.53 billion, and it spent $544 million annually to service the debt. Id. at II-493 (declaration of Phil Bakes, President and Chief Executive Officer of Eastern).
 
 
 4
 On July 28, 1988, ALPA and IAM filed motions for a preliminary injunction to halt Eastern's plans to implement the schedule changes and the furlough. On August 1, 1988, TWU joined as an additional plaintiff. The unions alleged that the changes would violate several provisions of the Railway Labor Act ("RLA"), 45 U.S.C. Secs. 151, et seq. (1987).[2] They argued that the changes were part of a massive restructuring plan that was designed to destroy the unions and to transfer assets and business away from the unionized Eastern Airlines and to the much less unionized Continental.
 
 
 5
 Specifically, the unions claimed that the disputes over the schedule changes and furlough should be considered "major disputes" under the RLA and that Eastern's conduct violated Sec. 6 of the Act (also called the status quo provision), which prohibits either party to a collective bargaining agreement from altering the existing rates of pay, rules or objective working conditions until it has exhausted the collective bargaining process. 45 U.S.C. Sec. 156; see also id. at Sec. 152 First (all carriers have the duty to "exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, ... in order to avoid any interruption to commerce or to the operation of any carrier"); id. at Sec. 152 Seventh (explaining the process for resolving disputes). The unions also alleged that Eastern's reductions were an illegal attempt to transfer work to Continental and to weaken or destroy the unions, in violation of Sec. 2 Third and Fourth of the RLA. These provisions prohibit employers from interfering with, coercing or influencing the representational choices of workers and from interfering with the right of employees to organize in labor unions. Id. at Sec. 152 Third and Fourth.
 
 
 6
 Though finding that Eastern's operational changes were "motivated by sound financial reasons" and that the withdrawal from the Kansas City hub was prompted by "legitimate and compelling business reasons," Air Line Pilots Ass'n Int'l v. Eastern Air Lines, Memorandum Opinion, Civil Action No. 87-2002, at 28 (D.D.C. Aug. 30, 1988) ("Mem.Op."), the district court on August 30 enjoined the proposed furlough as an impermissible violation of the status quo working conditions. Air Line Pilots Ass'n Int'l v. Eastern Air Lines, Notice of Ruling, Civil Action No. 87-2002, at 2 (D.D.C. Aug. 30, 1988). The court allowed Eastern to proceed to implement the planned schedule changes.
 
 
 7
 On August 31 Eastern filed a Notice of Appeal, an Emergency Motion for a Stay Pending Appeal, and a Petition for a Writ of Mandamus. This court dissolved the preliminary injunction entered by the district court on the condition that Eastern post a $4.7 million bond, a sum that represented a month's payroll expense for the union-represented employees who would be furloughed, and granted the motion for an expedited appeal. Further briefing ensued, and the case was argued September 26, 1988.
 
 
 8
 We reverse the district court and hold that it should not have granted the motions for a preliminary injunction because the unions did not show a substantial likelihood of success on the merits. The preliminary injunction, which we previously dissolved on condition of Eastern's posting security covering furloughed union employees' pay for September, is now dissolved unconditionally.[3]
 
 I. SCOPE OF REVIEW
 
 9
 The party seeking a preliminary injunction under the Railway Labor Act must show a "reasonable probability of success" on the merits. Delaware & Hudson Ry. Co. v. United Transp. Union, 450 F.2d 603, 619 (D.C.Cir.), cert. denied, 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971). Although the parties have disagreed about what other showings are required for the issuance of an injunction under Sec. 6 of the Act, no one has disputed the threshold necessity of demonstrating a likelihood of success on the merits.
 
 
 10
 In reviewing the lower court's decision to grant a preliminary injunction, we must be aware of "the latitude given to the District Court ... to determine what evidence can properly be adduced in the limited time that can be devoted to a preliminary injunction hearing." Friends for All Children v. Lockheed Aircraft, 746 F.2d 816, 835 n. 32 (D.C.Cir.1984). We note, however, that the district court in this instance conducted a seven-day evidentiary hearing which included live testimony from eleven witnesses and testimony by written declarations from several more. Thus the latitude afforded to the discretion of the district court judge should reflect this opportunity to develop the facts fully.
 
 
 11
 Just as with any factual determinations, this court will reject the district court's findings of fact only if they are "clearly erroneous." Foundation on Economic Trends v. Heckler, 756 F.2d 143, 153 (D.C.Cir.1985). A factual finding is clearly erroneous if it is "without substantial evidentiary support or if it was induced by an erroneous application of the law." Cuddy v. Carmen, 762 F.2d 119, 124 (D.C.Cir.), cert. denied, 474 U.S. 1034, 106 S.Ct. 597, 88 L.Ed.2d 576 (1985) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).
 
 
 12
 Despite the formula that an appellate court may reverse a district court's preliminary injunction only for "abuse of judicial discretion," see Natural Resources Defense Council, Inc. v. Morton, 458 F.2d 827, 832 (D.C.Cir.1972), the court may review issues of law de novo, Friends for All Children, 746 F.2d at 835 n. 32; Morton, 458 F.2d at 832. When the district court's estimate of the probability of success depends on an incorrect or mistakenly applied legal premise, "the appellate court furthers the interest of justice by providing a ruling on the merits to the extent that the matter is ripe, though technically the case is only at the stage of application for preliminary injunction." Morton, 458 F.2d at 832; see also Ambach v. Bell, 686 F.2d 974, 980 (D.C.Cir.1982) (not hesitating to "delve into the merits of the controversy to the extent necessary for evaluation of the case before us" and citing Morton ).
 
 
 13
 Keeping these standards of review in mind, we begin our analysis of the factual findings and legal conclusions on which the district court based its decision to enjoin Eastern's proposed furlough of 2222 union-represented employees.
 
 
 14
 II. CLAIMS FOR A STATUS QUO INJUNCTION UNDER THE RAILWAY LABOR ACT
 
 
 15
 The Legal Framework for Classifying a Dispute under the RLA
 
 
 16
 Disputes between labor and management that arise under the RLA are classified by courts as either "major disputes" or "minor disputes." The label given to a dispute determines which of the two RLA dispute resolution procedures is appropriate. For "major disputes," Congress has created a process described by the Supreme Court as "almost interminable." Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union, 396 U.S. 142, 148, 90 S.Ct. 294, 298, 24 L.Ed.2d 325 (1969). After a period of negotiation, the dispute first is submitted to the National Mediation Board for voluntary arbitration and then may be subject to presidential intervention to ensure adjustment. 45 U.S.C. Secs. 154-60; Elgin, Joliet & Eastern Ry. Co. v. Burley, 325 U.S. 711, 725, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886 (1945). During the process of mediation and arbitration, neither party may alter the status quo, and either party is entitled to an injunction prohibiting any changes in "rates of pay, rules, or working conditions." 45 U.S. Sec. 156;[4] Railway Labor Executives Ass'n v. Consolidated Rail Corp., 845 F.2d 1187, 1190 (3d Cir.), cert. granted, --- U.S. ----, 109 S.Ct. 52, 102 L.Ed.2d 31 (1988). Finally, if the parties cannot resolve a major dispute through the mechanisms provided in the RLA, the union can initiate a strike in support of its bargaining position. Railway Labor Executives Ass'n v. Norfolk & Western Ry. Co., 833 F.2d 700, 704 (7th Cir.1987). The process is "purposely long and drawn out, based on the hope that reason and practical considerations will provide in time an agreement that resolves the disputes." Railway Clerks v. Florida East Coast Ry. Co., 384 U.S. 238, 246, 86 S.Ct. 1420, 1424, 16 L.Ed.2d 501 (1966).
 
 
 17
 For minor disputes--those "arising out of the interpretation of collective-bargaining agreements," International Ass'n of Machinists & Aerospace Workers v. Northwest Airlines, Inc., 673 F.2d 700, 706 (3d Cir.1982) (quoting Union Pacific R.R. Co. v. Sheehan, 439 U.S. 89, 94, 99 S.Ct. 399, 402, 58 L.Ed.2d 354 (1978) (per curiam))--Congress devised another route. After negotiation has failed, a minor dispute must be submitted to an arbitration board for resolution. 45 U.S.C. Sec. 184; see also 45 U.S.C. Sec. 153(i) (requiring that minor disputes between a railroad and its employees be submitted to the National Railway Adjustment Board). Significantly, the arbitration board's jurisdiction over minor disputes is exclusive; the courts do not have jurisdiction to issue status quo injunctions. Air Line Pilots Ass'n v. Northwest Airlines, Inc., 627 F.2d 272, 275 (D.C.Cir.1980). A union cannot make a minor dispute the subject of a strike.
 
 
 18
 Because the terms "major dispute" and "minor dispute" are not defined in the RLA (or even used by it), their meanings are largely a matter of judicial gloss on the Act. Chicago & North Western Transp. Co. v. Railway Labor Executives Ass'n, 855 F.2d 1277, 1281 (7th Cir.1988), stay granted pending decision on cert., 57 U.S.L.W. 3185 (September 21, 1988) (granted by Stevens, J.). The Supreme Court differentiated between the two types of disputes in Elgin, Joliet & Eastern Ry. Co. v. Burley, and its formulation has guided courts since 1945:
 
 
 19
 [A "major dispute"] relates to disputes over the formation of collective agreements or efforts to secure them.... They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.
 
 
 20
 [A "minor dispute"], however, contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. In the latter event the claim is founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement, e.g., claims on account of personal injuries. In either case the claim is to rights accrued, not merely to have new ones created for the future.
 
 
 21
 325 U.S. at 723, 65 S.Ct. at 1289. Using a characterization suggested by the Supreme Court's definitions, the First Circuit has held that a minor dispute is one that "arguably" can be covered by the existing collective bargaining agreement. Maine Central R.R. Co. v. United Transp. Union, 787 F.2d 780, 782 (1st Cir.), cert. denied, 479 U.S. 848, 107 S.Ct. 169, 93 L.Ed.2d 107 (1986); see also Brotherhood of R.R. Signalmen v. Burlington Northern R.R. Co., 829 F.2d 617, 619 (7th Cir.1987) (minor dispute is one "arguably comprehended within an already existing collective bargaining agreement").
 
 
 22
 As these passages suggest, the first point of reference for determining whether a dispute is minor or major is the collective bargaining agreement. But in ascertaining whether the "disputed actions are justified by or fall within the parameters of an existing collective bargaining agreement, the courts are permitted to look to the 'settled past practices of the parties' under that agreement." Chicago & North Western Transp. Co., at 1282 (quoting Brotherhood of Maintenance of Way Employees, Lodge 16 v. Burlington Northern R.R. Co., 802 F.2d 1016, 1017 (8th Cir.1986)). The emphasis on past practice as a guide in RLA cases began with the Supreme Court's Shore Line decision, where the Court held that
 
 
 23
 the mere fact that the collective agreement before us does not expressly prohibit [certain conduct] would not have barred the [employer from engaging in that conduct] if, apart from the agreement, such [conduct] had occurred for a sufficient period of time with the knowledge and acquiescence of the employees to become in reality a part of the actual working conditions.
 
 
 24
 396 U.S. at 153-54, 90 S.Ct. at 301.
 
 
 25
 Although Shore Line dealt with the working conditions that constitute the status quo, subsequent courts have inferred from the holding that past practice is a relevant consideration in the dispute classification process as well. See, e.g., National Ry. Labor Conference v. International Ass'n of Machinists & Aerospace Workers, 830 F.2d 741, 746-47 (7th Cir.1987). To gain a complete picture of the relationship between the parties, and thus of the scope of the dispute to be settled by the provisions of the RLA, courts must consider the express terms of any agreements and well established practices that have developed through the past course of dealings. Railway Labor Executives Ass'n v. Norfolk & Western Ry. Co., 833 F.2d at 705 ("A written agreement, however, does not necessarily contain all relevant working conditions.... The parties' collective agreement, therefore, includes both the specific terms set forth in the written agreement and any well established practices that constitute a 'course of dealing' between [them]."); Maine Central R.R. Co., 787 F.2d at 782 ("[P]ast practices and working conditions may become part of the collective bargaining agreement notwithstanding silence in the agreement itself.").
 
 
 26
 As we look at the provisions of the collective bargaining agreements and at the past course of dealing between the parties, we recognize that not all past practice is relevant in our inquiry. Instead, we must consider only prior conduct
 
 
 27
 which has attained the dignity of a relationship understood by the parties to at least impliedly serve as if part of the collective bargaining agreement.... An "established practice" under the Act should demonstrate not only a pattern of conduct but also some kind of mutual understanding, either expressed or implied.... Among the factors one might reasonably consider would be the mutual intent of the parties, their knowledge of and acquiescence in the prior acts, along with evidence of whether there was joint participation in the prior course of conduct, all to be weighed with the facts and circumstances in the perspective of the present dispute.
 
 
 28
 United Transp. Union, Local Lodge No. 31 v. St. Paul Union Depot Co., 434 F.2d 220, 222-23 (8th Cir.1970), cert. denied, 401 U.S. 975, 91 S.Ct. 1194, 28 L.Ed.2d 324 (1971).
 
 
 29
 Classifying the Dispute Between Eastern and TWU
 
 
 30
 The collective bargaining agreement currently in force between TWU and Eastern does not expire until December 31, 1988; thus we can look first at the provisions of this agreement to discover whether the dispute is arguably covered by its terms. Although the district court found that these provisions "clearly do not authorize Eastern to cut[ ] its labor force 12 percent," Mem.Op. at 16, the record shows this finding to be without substantial support and clearly erroneous.
 
 
 31
 Section 15 of the Flight Attendants Agreement between Eastern and TWU outlines extensive procedures whereby union members may be furloughed due to "reduction[s] in force." Appellant's App. II-415-16. The parties' explicit bargain over furlough procedures plainly rests on the premise that furloughs are permissible. The provision does not indicate that its application is limited to very small scale furloughs; thus a dispute over furloughs appears to be at least "arguably comprehended within [the] already existing collective bargaining agreement."
 
 
 32
 Turning to past practice, the district court found that "Eastern's proposed furloughs are not justified by its past practices. None of Eastern's prior job terminations are comparable in scope and breadth to the scheduled furloughs. Nor have the unions ever acquiesced to any furloughing of this magnitude." Mem.Op. at 16.
 
 
 33
 After searching the record for any support for such a conclusion, we conclude that the finding is clearly erroneous. Furloughs of significant proportions have occurred in the past. 494 flight attendants were furloughed in January 1974, and 1102 flight attendants were furloughed in February 1986--more than the 1050 who would be furloughed under Eastern's current proposal. Nothing in the record or in the unions' brief indicates that the TWU refused to acquiesce in these prior furloughs, nor is there evidence that a furlough of over 1000 flight attendants was considered in February 1986 to be outside the coverage of Section 15 of the agreement.
 
 
 34
 The unions argue that the past furloughs were seasonal and that this aspect made them qualitatively different from Eastern's proposed furlough. But the contract's language is quite broad and evidences an awareness that work reductions might be necessary in the future; it does not specify what forces might cause such reductions. Moreover, plaintiffs have offered no evidence to support the contention that the past furloughs were merely responses to seasonal variations. Their scale renders any such claim implausible. Not only are the numbers of TWU members similar to those previously furloughed, but the 15.4% reduction in aircraft hours is quite similar to the 1981 cutback of 14%, and not drastically out of line with five other previous cutbacks of more than 10%. Appellant's App. II-265.
 
 
 35
 Finally, the unions appear to argue that the current proposal is different from past furloughs because it is motivated by the anti-union animus of Eastern's management. The decisions of courts confronted with the proposition that anti-union sentiment can transform a minor dispute into a major one do not clearly explain their ultimate holdings. See Independent Union of Flight Attendants v. Pan Am. World Airways, Inc., 789 F.2d 139, 141-42 (2d Cir.1986); International Ass'n of Machinists & Aerospace Workers v. Northwest Airlines, 673 F.2d at 706-11. In light of our resolution of the unions' claims under Sec. 2 Third and Fourth, however, we do not find it necessary to resolve the issue in this case.
 
 
 36
 Given the express contractual terms and the similarity between the proposed furlough and previous ones, the record compels a finding that Eastern's proposal was covered by the collective bargaining agreement and the course of dealing between the company and TWU. This furlough is a minor dispute for purposes of resolution through the RLA, and the district court lacked jurisdiction to enjoin Eastern's furlough of TWU members.
 
 
 37
 Classifying the Disputes between Eastern and ALPA and IAM
 
 
 38
 Classifying the dispute between Eastern and the other two unions is more problematic because there are no collective bargaining agreements currently in force. Eastern and the two unions agree that their contracts expired before this appeal and that both unions have filed Sec. 6 notices indicating their intention to negotiate changes in the agreements. The unions argue that once these two events have occurred, any dispute between the unions and the airline is automatically major.
 
 
 39
 International Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Aloha Airlines, Inc., 776 F.2d 812 (9th Cir.1985), adopted the unions' view. The court noted that the "twin occurrences" of the expiration of the agreement and the filing of Sec. 6 notices establish a "statutory status quo." This is so because Sec. 6 forbids the carrier to change "the rates of pay, rules, or working conditions." "Thus," the court reasoned, "the inquiry is not one which looks to the parties' collective bargaining agreements; instead, the Act requires an objective determination of the actual status quo.... Since the dispute ... was neither contemplated nor arguably covered by ... the [agreements], it cannot be a minor dispute." 776 F.2d at 816; see also Air Cargo Inc. v. Local Union 851, Int'l Brotherhood of Teamsters, 733 F.2d 241, 245-46 (2d Cir.1984) (stating that any dispute after service of Sec. 6 notices and the expiration of the contract is major, but without indicating its reasoning).
 
 
 40
 We are not persuaded by this analysis. It appears to disregard the existence of disputes that are altogether outside the contractual relation of the parties and to slight the long line of precedents, deriving from Shore Line, that emphasize settled past practice in classifying disputes as major or minor. Moreover, it seems to thwart Congress's policy decision to provide for two distinct dispute resolution procedures under the RLA.
 
 
 41
 In Elgin, Joliet & Eastern Ry. Co. v. Burley, the first major Supreme Court pronouncement on the distinction between major and minor disputes, the Court noted that a minor dispute either contemplates an existing contract or concerns a situation in which neither party is attempting to change the relationship's terms. Significantly, the Court said that minor disputes could encompass a claim "founded upon some incident of the employment relation ... independent of those covered by the collective agreement, e.g., claims on account of personal injuries." 325 U.S. at 723, 65 S.Ct. at 1289 (emphasis added). We can see no reason why disputes that are "independent" of the agreement and that before the "twin occurrences" unquestionably would be minor should not be so thereafter. If we are right on that, at a minimum the concept that disputes after expiration of the contract (plus Sec. 6 notices) cannot be minor must be qualified to that extent.
 
 
 42
 More generally, the Court in Burley drew a line between "the acquisition of rights for the future," as opposed to the "assertion of rights claimed to have vested in the past." Id. The fact that the parties' legal obligations arise from Sec. 6's statutory continuation of "working conditions" does not automatically mean that any dispute which arises necessarily revolves around the acquisition of new rights, rather than the definition of vested ones.
 
 
 43
 As the earlier discussion made clear, courts defining the nature of a dispute have emphasized since Burley not only explicit contractual terms but also the past course of dealing between the parties. See, e.g., Railway Labor Executives Ass'n v. Consolidated Rail Corp., 845 F.2d at 1191 (holding that the terms of an agreement may be inferred from habit and custom); Brotherhood of Locomotive Engineers v. Burlington Northern R.R. Co., 838 F.2d 1087, 1091-92 (9th Cir.) (past practice considered as an implied-in-fact term in the agreement), petition for cert. filed, 56 U.S.L.W. 3720 (April 1, 1988). The concurrence in Brotherhood of Maintenance of Way Employees, Lodge 16 v. Burlington Northern R.R.Co. explains why the courts focus as intensively on practice as on the express agreement.
 
 
 44
 Since, as a practical matter, it is impossible for the written collective-bargaining agreement to describe every possible permutation of working conditions which might arise, it is not unusual for the parties to a labor agreement to develop working relationships, customs, and practices which are understood to be the norm, but which are nowhere reduced to a formal contract term. When long-standing practice ripens into an established and recognized custom between the parties, it ought to be protected against sudden and unilateral change as though it were part of the collective-bargaining agreement itself.
 
 
 45
 802 F.2d at 1022 (Arnold, J., concurring). As the norms generated by practice are protected from unilateral change by Sec. 6, they are also available to classify a dispute.
 
 
 46
 Most important, Aloha appears to ignore the purposes behind the RLA's bifurcated dispute resolution procedure. The RLA was designed to provide mechanisms that would "facilitate the orderly and peaceful resolution of labor-management disputes." Chicago & North Western Transp. Co., at 1281. To that end, Congress devised one track, with a focus on arbitration, for minor disputes that center around the definition of rights already agreed upon, and another, with a focus on mediation (and potential presidential intervention), for major ones that raise broader issues likely in themselves to engender a strike. The expiration of the collective bargaining agreement tells us little or nothing about the track for which a dispute is suitable. Yet the consequence of the Aloha rule is that after the filing of a Sec. 6 notice and the expiration of a bargaining agreement, no dispute between the parties can proceed along the track devised by Congress for "minor" disputes. Accordingly, we reject the proposition that the expiration of the agreements and filing of Sec. 6 notices automatically make the dispute a major one.
 
 
 47
 To discern the nature of the dispute between Eastern and the unions, we first look to the provisions contained in their now expired contracts; these serve as evidence of settled past practice.
 
 
 48
 Section 28L of the Eastern-ALPA Collective Bargaining Agreement sets out procedures in a domicile closing or category curtailment. Appellant's App. II-314-38. Section 40 provides a detailed mechanism for effecting furloughs, including criteria of eligibility for furlough pay and a preclusion of furloughs for the one year starting April 1, 1982, except for specific causes including strike, work stoppage, national emergency, act of God and grounding of a substantial number of aircraft for reasons of safety. Id. at II-339-42. The latter provision obviously assumes that, after the one-year preclusion, furloughs are permitted even for reasons not enumerated there.
 
 
 49
 The agreement clearly contemplates large-scale furloughs. It provides that if furloughs reach pilots hired in or before 1973, the union will be entitled to insist on more restrictive work rules. If the agreement had been binding as a matter of contract law in the summer of 1988, Eastern could have furloughed about 1450 relatively junior pilots (out of 4100 on its seniority list) without triggering this clause. See id. at II-97-99, 357.
 
 
 50
 The Eastern-IAM Collective Bargaining Agreement contains provisions strikingly similar to the other agreements' furlough and work reduction provisions, and equally clearly reflects an assumption that substantial furloughs were authorized. Article 15 provides that in reductions in force (as well as in many other matters) employees with greater seniority must receive preference; it also establishes rights to be rehired. Id. at II-387-89. Article 20 provides notice for non-probationary employees laid off through no fault of their own. Id. at II-392; see also id. at II-401 (Clarification of Articles 15(B)-20(F)). Moreover, it restricts the furlough of IAM-represented employees hired after May 16, 1984. Only 8100 of Eastern's 9500 IAM-represented employees would have been protected by that restriction if the explicit contract had been binding. Id. at II-108, 109, 383, 385.
 
 
 51
 Not only do these provisions indicate that furloughs were contemplated by the parties, but Eastern has furloughed pilots and IAM-represented workers in the past. In January through June 1974, 694 pilots were furloughed by the company. Id. at II-417. A number of IAM-represented employees have been furloughed every year since 1974, including 935 employees in 1981; 1384 employees in 1983; and 1429 employees in 1987. Id. at II-418. Eastern's current action is in line with prior practice; we can discover no significant difference in the scale of the furlough announced July 22 (1172 IAM members) and those actually implemented in the past. (As noted above, Eastern has as yet issued no furlough notices for pilots in connection with the September cutbacks.) Thus the district court's finding that the planned furlough was inconsistent with past practice is clearly erroneous. The dispute is properly considered as a minor one within the exclusive jurisdiction of the adjustment board.
 
 
 52
 As in the TWU situation, the unions argue that several conditions present in the dispute transform it into a major dispute. We have dealt previously with all their arguments on this issue except for their suggestion that the mere serving of Sec. 6 bargaining notices changes the nature of the dispute. This position is supported by the court's assertion in Air Cargo that "the disputes ... began with section 6 notices proposing changes in the collective bargaining agreement affecting working conditions and are thus 'major disputes.' " 733 F.2d at 245-46. We believe that a rule that allows a party to characterize all disputes as "major" through a unilateral action such as serving Sec. 6 notices on the other party is unwise and contrary to the two-track procedure of the RLA.
 
 
 53
 III. ILLEGAL INTERFERENCE WITH EMPLOYEES' PARTICIPATION IN UNIONS
 
 
 54
 Sec. 2 Third and Fourth of the Railway Labor Act provide a potential independent ground for the district court's injunction of the September furlough. Under Sec. 2 Third no party may "interfere with, influence, or coerce the other in its choice of representatives." 45 U.S.C. Sec. 152 Third.[5] Under Sec. 2 Fourth a carrier may not "interfere in any way with the organization of its employees" or "influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization." 45 U.S.C. Sec. 152 Fourth.[6]
 
 
 55
 The plaintiff unions argue that the September furlough, viewed in its full context, represents the sort of coercive anti-union action forbidden by Sec. 2 Third and Fourth. As we read plaintiffs' contentions, these contextual elements fall into the following categories:
 
 
 56
 1. In reality the September cutbacks and furlough represent an effort to transfer work from Eastern to its less unionized affiliate, Continental Airlines.
 
 
 57
 2. The September cutbacks represent but one step in a "downsizing" that has "no rational economic stopping point" unless the unions acquiesce in Eastern's claim that wage reductions are needed. Mem.Op. at 22.
 
 
 58
 3. The business exigencies behind the September cutbacks, however severe, derive from a deliberate effort to "bleed" Eastern and thereby to inhibit unionization.
 
 
 59
 4. The cutbacks and furlough are driven by a general anti-union animus and demonstrate an intent to "send a message" to employees that their unions are unable to protect them.
 
 
 60
 At the outset, the union's position on each of these theories runs into an almost insuperable hurdle. The district court judge found that "the proposed operational changes are motivated by sound financial reasons." Mem.Op. at 28. He noted that "[e]ven plaintiffs' experts agreed that Eastern has legitimate and compelling business reasons to withdraw from the Kansas City hub." Id. Even at this stage, plaintiffs appear not to contest the point, and it is difficult to see how they could. Through discovery the plaintiffs had access to internal Eastern documents, including flight profitability data. Yet they have directed our attention to nothing that would undermine Eastern's claim that legitimate business concerns provide an ample reason for these reductions. As such data would provide the best imaginable means for any such undermining, the only reasonable inference appears to be that the point is not disputable in any material sense. The documents before us indicate that the flight cancellations will annually save Eastern between $99 and $119 million. See Appellant's App. II-72, 257-62.
 
 
 61
 The district court sought to draw a line between the operational changes, which it accepted as motivated by legitimate business reasons, and the furlough conducted to implement them. Compare Mem.Op. at 27-28 (operational changes similar to past actions and motivated by sound business reasons) with id. at 28 (furlough not consistent with past practice and impermissible). We think the distinction sustainable neither as a matter of fact or law. If the operational changes were legitimately motivated, it was by Eastern's interest in reducing losses. Obviously chopping its revenue without its expenses could not possibly reduce losses.
 
 
 62
 We thus must read the district court's decision as finding mixed motivation--a legitimate purpose to reduce losses and an illegitimate one to intimidate the unions and their membership. In the parallel area of employee dismissals challenged as coercive or discriminatory under Secs. 8(a)(1) and 8(a)(3) of the NLRA, the NLRB has adopted the rule that the employer is exonerated if it can establish that it would have dismissed the employee even if he had not been involved with the union. See NLRB v. Transportation Management Corp., 462 U.S. 393, 395, 103 S.Ct. 2469, 2471, 76 L.Ed.2d 667 (1983), citing Wright Line, 251 N.L.R.B. 1083 (1980), enf. granted, NLRB v. Wright Line, 662 F.2d 899 (1st Cir.1981), cert. denied, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982); see also Grosschmidt v. Chautauqua Airlines, Inc., 107 Lab.Cas. (CCH) p 10,072 (N.D. Ohio 1986) (applying Wright Line test in RLA context); Stepanischen v. Merchants Despatch Transp. Corp., 99 Lab.Cas. (CCH) p 10,579 (D.Mass.1983), aff'd in part, rev'd in part and remanded, 722 F.2d 922 (1st Cir.1983) (same); AFM Pilots Ass'n v. AFM Corp., 96 Lab.Cas. (CCH) p 14,115 (D.Mass.1982) (same). Eastern contends that the Wright Line test should apply in this area, and that under it the judge's finding that the changes were motivated by legitimate business purposes disposes of any claim based on accompanying illegitimate purposes.
 
 
 63
 We are persuaded that the Wright Line principle is applicable here. In its Wright Line opinion, the NLRB drew on the Supreme Court's treatment of dual motivation in Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). There the school district had discharged an employee who had engaged in some offensive conduct that was not protected by the First Amendment and in some protected conduct. The Court held that the discharge was lawful if the employer could show that it would have dismissed solely on the basis of the unprotected conduct. It reasoned that such a rule adequately vindicated the constitutional principle as it left the employee "in no worse a position than if he had not engaged in the [protected] conduct," id. at 285-86, 97 S.Ct. at 575, and that an employee should not be able, "by engaging in [protected] conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record," id. at 286, 97 S.Ct. at 575. The NLRB regarded the principles as transferable to the context of Secs. 8(a)(1) and 8(a)(3).
 
 
 64
 The Mt. Healthy reasoning seems equally applicable here. Workers' Railway Labor Act rights to unionize are adequately protected so long as management is limited to taking only measures that it would have taken in the absence of any anti-union animus. Similarly, unions should not be able to immunize their members from market forces merely by engaging in conduct virtually certain to provoke anti-union feeling. (The issue of perverse incentives is especially acute in the context of allegations of general anti-union animus; we discuss it below in reference to those claims.) Application of the Wright Line principle will provide as full protection for the union activity protected by Sec. 2 Third and Fourth as Mt. Healthy does for the exercise of First Amendment rights and will avoid creating perverse incentives in either management or labor.
 
 
 65
 In NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027 (1967), the Court identified a class of anti-union acts that are "inherently destructive" of important employee interests, so that "no proof of anti-union motivation is needed." Plaintiffs urge us to apply Great Dane and bypass Wright Line. But the NLRB observed in Wright Line itself that employee dismissals are not inherently destructive, 251 N.L.R.B. at 1088, and we think the same is true of furloughs, which preserve the employees' right to return when work expands. The vast majority of acts found "inherently destructive" appear to be ones that discriminate solely on the basis of union membership. See 3 Theodore Kheel, Labor Law, Sec. 12.03 (1987 & Supp.1988); see, e.g., NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967) (unjustified failure to reinstate ex-strikers held unlawful without reference to employer's intent); NLRB v. Erie Resistor Corp., 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963) (grant of superseniority to strike replacements and workers coming off the strike held inherently destructive); C.H. Heist Corp. v. NLRB, 657 F.2d 178 (7th Cir.1981) (disparate treatment of union officials held to be inherently destructive); Kroger Co. v. NLRB, 401 F.2d 682 (6th Cir.1968), cert. denied, 395 U.S. 904, 89 S.Ct. 1742, 23 L.Ed.2d 217 (1969) (action denying union members access to profit sharing plan held unlawful without showing of anti-union animus). Here, by contrast, there is no claim that Eastern has tailored its reductions so as to impose a differential impact on union members. Indeed, it appears that the furlough affects union members and non-members in roughly their proportions of Eastern's workforce. See Appellant's App. II-275, 447. Accordingly, we believe that Great Dane provides no basis for avoiding the Wright Line principle.
 
 
 66
 Although the district court did not intentionally apply the Wright Line principle, we believe that its characterization of Eastern's changes in operations as "motivated by sound financial reasons," Mem.Op. at 28, must be viewed as a finding that the financial reasons constituted an independent and sufficient motive for the September cutbacks as a whole, including the associated furlough. As a motive that compels action must surely satisfy that test, the union's concession that Eastern had "legitimate and compelling business reasons" for the withdrawal from the Kansas City hub would seem to preclude any other finding.
 
 
 67
 We nonetheless proceed to examine the plaintiffs' contentions in some detail. We find that the present record provides little support for any possible finding that forbidden purposes drove Eastern's decisionmaking.
 
 Work Transfer
 
 68
 Eastern is far more heavily unionized than Continental. (About 60% for Eastern, less than 20% for Continental. See Appellant's App. I-274-75.) An employer may be found to have violated Sec. 8(a)(1) of the National Labor Relations Act, 29 U.S.C. Sec. 158(a)(1) (1982) (prohibiting interference with employees' organizing rights under the act), if it deliberately transfers work from a unionized location to a non-unionized one. In our circuit, the determinant of whether such a shift is illegal is "whether the change in relative economic fortunes was due to external economic circumstances or to a change in the employer's established practices." Road Sprinkler Fitters Local Union No. 669 v. NLRB, 676 F.2d 826, 832 (D.C.Cir.1982). We assume that the same standard applies under Sec. 2 Third and Fourth of the RLA (as both parties appear to argue) and that, given the differential in union membership between the two affiliates, we should treat Continental as if it were altogether non-union for these purposes.
 
 
 69
 In pressing this claim, the unions again encounter a formidable factual problem. In the September cutbacks the vast majority of Eastern's reductions in service occurred in markets where Continental is not presently a factor. The only figures on this subject are those offered by Eastern. First they address non-stop flights, where the competitive relationship between carriers is most easily measured. Their data are as follows:
 
 
 70
 Eastern Non Stop Percent of Total
Other Daily Eastern Daily
Carrier Flights Eliminated Flight Reduction
----------------------------------------------------------
 Braniff 70 34.2%
 Delta 65 32.0%
USA/Piedmont 35 16.9%
 American 32 15.8%
 United 11 5.4%
 Pan Am 11 5.2%
 TWA 10 5.0%
 Continental 8 3.9%
----------------------------------------------------------
 
 
 71
 Appellant's App. II-271. These figures appear not to be disputed.
 
 
 72
 Second, Eastern offered figures purporting to consider the potential benefit to Continental through the elimination of the Kansas City hub, which accounts for 84% of the reduction in aircraft hours. Using a database compiled by the Department of Transportation on the origins and destinations of airline traffic, the table appears to measure specific airlines' shares of multi-stop traffic between city pairs regardless of routing. The figures appear to constitute at least a reasonable starting point for assessing the competitive impact of the reductions on Continental and other airlines. (The unions offer some objections to the data, discussed below.) The figures are as follows:
 
 
 73
 Eastern's Average
 Monthly Percentage of
 Kansas City On Board Total Eastern
Carrier Passengers 1 Traffic 2
-------------------------------------------------------------------------------
Braniff 50,372 22.7%
United 33,111 14.9%
American 26,271 11.9%
Northwest 19,578 8.8%
TWA 17,538 7.9%
Southwest 17,130 7.7%
Continental 12,942 5.8%
Delta 10,586 4.7%
Eastern 6,108 3.3%
 Retention
USAir/Piedmont 6,589 2.9%
America West 5,762 2.6%
All Other 15,692 7.1%
 SOURCE: Passenger Data from Eastern Air Lines Internal
 Records.
 Boeing Company O & D Traffic Database, 2nd Quarter, 1987.
 NOTE: 1. Based on Eastern's average monthly passenger
 traffic, August, 1987 through March, 1988.
 2. Allocation to other carriers from Boeing Co. O & D
 Traffic Database.
-------------------------------------------------------------------------------
 
 
 74
 Id. at II-455.
 
 
 75
 At first blush, then, the data seem to provide feeble support for the proposition that the September cutbacks are designed to shift work to Continental. If Continental will gain, say, only 5.8% of the traffic abandoned by Eastern, the cutbacks surely represent a costly, not to say bizarre, method for transferring work to Continental.
 
 
 76
 The plaintiffs respond, however, by calling our attention to evidence that in their view suggests the presence of a forbidden work transfer: (1) possible vulnerability in Eastern's data; (2) special aspects of the relation between Eastern and Continental that can be expected to enable the latter to take exceptional advantage of Eastern's moves; (3) past conduct that they view as work transfers; and (4) statements by officials of the affiliated airlines, appearing to threaten to transfer work. We address them in that order.
 
 
 77
 Vulnerability in Eastern's data. Although in their brief the plaintiffs never addressed the validity of Eastern's data as to the likely competitive winners from the September cutbacks, at oral argument they called our attention to a declaration by Jalmer D. Johnson, chief economist for plaintiff ALPA, attacking the figures. First, Johnson points out that the data compare one period for Eastern with another for the competing airlines. Second, he argues that participants in the joint Eastern-Continental frequent flyer program ("One Pass") will be more likely to turn from Eastern to Continental than the numbers suggest. Appellees' Appendix ("Appellees' App.") 805-06.
 
 
 78
 These are clearly imperfections in the data. But we do not have, and the district court did not have, any basis for concluding that they drive a serious hole in Eastern's showing. If, for example, as Eastern argues, the One Pass link is of limited importance because business travelers typically participate in several frequent flyer programs, its mere existence proves relatively little. In effect, plaintiffs have offered nothing to substantiate their contention that a more accurate calculation would support an inference that the September cutbacks constitute an illegal work transfer.
 
 
 79
 Special features of the Eastern-Continental relationship. Plaintiffs offered evidence, and the district court found, that since Texas Air acquired Continental in 1986, there had been meetings between the management of Eastern and Continental, and that among the topics discussed were conflicts between their respective hubs, capacity levels in overlapping markets, market objectives and pricing strategy. Mem.Op. at 9. At some time prior to the July 22 announcement of the September cutbacks, evidently on June 28, 1988, Appellees' App. 511-12, Eastern alerted Continental to the plans it would later reveal to the world at large.
 
 
 80
 As for the general consultation on competitive relations, the proof of the pudding must be in the eating. For this evidence to substantiate a claim of forbidden work transfer, it must support an inference that the conduct here will eventuate in a shift of work to Continental that is material in relation to the total program and that evidences something other than a response to "external economic circumstances." Nothing suggests that. First, consultation between Eastern and Continental is at most a pale imitation of what appears in the typical work transfer case, where a unified management directly controls all operations of the "double-breasted" firm. The work transfer cases obviously assume that combined management of union and non-union efforts does not itself establish forbidden transfer. Second, the consultations do not appear in the past to have brought about a shift in abandoned Eastern traffic to Continental. In the section below on past conduct, we review the data and cannot find evidence of such a shift; in its absence, the issue of a causal link is moot. Cf. Boise Cascade Corp. v. FTC, 837 F.2d 1127, 1144 (D.C.Cir.1988) (causal connection cannot be inferred if the alleged effect has not occurred).
 
 
 81
 As to the advance information on prospective cutbacks, plaintiffs offer no evidence to support the inference that this will give Continental a material competitive edge over other firms that may be tempted to replace Eastern in the routes it has abandoned. The time afforded Continental at most doubled that available to the others. To be sure, as counsel pointed out at oral argument, Continental also may benefit from flight profitability data entirely unavailable to others. But all this is, again, information that a typical "double-breasted" firm will carry in a single head. Without a showing that the advantage will likely lead to Continental's grasping far more of the abandoned traffic than the figures on existing competition suggest, the conversations cannot show work transfer.
 
 
 82
 Past conduct. The plaintiffs offered a declaration by ALPA's economist, Johnson, to establish past work transfer. Perhaps the strongest data in this category are those showing the evolution in Eastern's non-stop flights, including those in competition with Continental, from January 1987 to July 1988. While the total non-stop flights declined from 633 to 507 (a drop of 126 flights), the numbers and share in competition with Continental declined more sharply--from 55 competing flights to 24, or from 8.7% of Eastern's total to 4.7%. Appellees' App. 710.
 
 
 83
 What is most striking about the figures, however, is the very modest role of direct Eastern-Continental competition. The complete extinction of Eastern at the outset of its acquisition by Texas Air would have conferred only a very modest competitive advantage on Continental. Even measured against Eastern's reductions from January 1987 to July 1988, the relation to Continental is small. The total reduction in flights where the affiliates competed was 31, less than 25% of the net reduction in Eastern non-stops. As with the data on the September changes, the arguable "work transfer" appears swamped by the overall decline of Eastern and, presumably, benefit to non-affiliated airlines. To characterize Eastern's conduct from January 1987 to July 1988 as a work transfer, one would have to draw an altogether implausible inference as to its readiness to cloak the transfer in shifts to other airlines.
 
 
 84
 Johnson also argued that work was indirectly transferred, through Eastern's withdrawal from routes followed by Continental's entry. Id. at 658. Johnson appears to offer no data on the scope of such shifts, however.
 
 
 85
 Finally, Johnson noted substantial growth by Continental over the period from January 1987 to July 1988. In fact the growth appears relatively modest. According to his table, Continental's "available seat miles" rose about 12% over that 18-month span, from 4,951,035 to 5,596,454. Id. at 693. This compares with a growth of about 33% in calendar year 1985, id., and is thus in itself hardly a ground for suspicion. In any event, growth by Continental could not establish work transfer without proof linking it to retreat (or other conduct) by Eastern. If Eastern retreats from the Washington-Miami traffic and Continental advances in Chicago-Los Angeles, it hardly proves work transfer. Apart from aggregate figures on change in the two airlines' size, Johnson offered only anecdotal market-by-market evidence. He offered nothing to show that the individual market evidence added up in the aggregate to any material portion of the airlines' overall evolution. This much, at least, was necessary for the past developments to support a serious prediction that the September cutbacks would eventuate in work transfer.
 
 
 86
 It is worth noting that one area of arguable past work transfer, highlighted by plaintiffs and by the district court (Finding No. 13, Mem.Op. at 9), is flatly irrelevant to the present case. In the fall of 1986 Eastern withdrew from the Miami-London route, and several months later Continental stepped in. Eastern had held a "co-certificate" for the route with Continental, meaning that the two of them shared legal authority to offer service on those runs. Despite domestic airline deregulation, airlines may enter international routes only if they hold a certificate to do so (or if by international agreement the route has been opened for competition to all comers). See Horizon Air Indus., Inc. v. United States Dep't of Transp., 850 F.2d 775 (D.C.Cir.1988). Since domestic routes are deregulated, a withdrawing airline has no legal entitlement to enter and therefore none to transfer. Counsel inform us, without contradiction, that all routes in the September schedule changes are domestic. Accordingly, if the Miami-London story is one of transfer, it is one that these cutbacks cannot duplicate.
 
 
 87
 At several points the district court's opinion alluded without supporting detail to a "transfer of assets" to Continental. Mem.Op at 10, 18, 21. As we have seen, any past transfer of route certificates is quite irrelevant to the conduct at issue here. If the court referred to transfer of airplanes, the record provides no support. It indicates a net transfer of two planes. Appellant's App. II-28A. Given the scale of these airlines (Eastern has 260 aircraft, Continental 346, see id. at I-318, II-62, 257), this is immaterial.
 
 
 88
 Statements of affiliated airline officials. Plaintiffs stress, as did the district court, statements of officials of Texas Air, Eastern and Continental suggesting an outright determination to transfer work. Perhaps the most provocative of these is a statement prepared for Frank Lorenzo to deliver to investment bankers in Japan:
 
 
 89
 We will be negotiating with Eastern's unions to develop a compensation framework that allows Eastern to survive intact and I would hope that Eastern's unionized employees will choose to be part of a profitable airline with profit-sharing and incentive payments that replace job-destroying high cost labor contracts.
 
 
 90
 On the other hand we are realistic enough to know that Eastern's union leadership, as differentiated from the workers themselves, may not easily concede these issues and that we must be able to negotiate from a position of strength. These are complex issues, but I can assure you that we have considerable leverage. For example, if necessary, Eastern aircraft can be repainted and moved over to Continental where they would be flown by non-union pilots. This flexibility should improve the chances of negotiating fair and economic contracts with Eastern's unions.
 
 
 91
 Mem.Op. at 18-19 (emphasis added by district court). Less dramatic than the proposal to repaint airplanes, but still suggestive, is a comment of Eastern's President and Chief Executive Officer, Phil Bakes, in a July 21, 1987 Falcon, a publication of Eastern:
 
 
 92
 We can help bring this [transition to lower labor costs] about in a way smoother than it can be brought about in any other way. Although we want to make a return on the assets of the company by operating them at Eastern Airlines, if we fail in this mission, those assets will have a return one way or another. That you can count on.
 
 
 93
 Id. at 20. Later Bakes, again in Falcon, suggested an intent to shift assets:
 
 
 94
 EAL can make a comeback ... if labor costs [are] restructured soon....
 
 
 95
 [President Phil Bakes] points out that Eastern has had some measure of market share success by introducing a unique fare structure for the business traveler at major hubs. And, restructuring labor costs among the union-free groups has been successful.
 
 
 96
 Id. at 21 (emphasis added by district court).
 
 
 97
 We think that any fact-finder could read these statements as manifesting an intent to transfer work. We will assume that the statements are enjoinable as violations of Sec. 2 Third and Fourth. But we find them insufficiently connected to the September cutbacks to support a finding that those acts were forbidden work transfer. Where the routes dropped by the unionized company and the less unionized affiliate's existing routes do not correlate sufficiently, we do not see how a floating intent to transfer work can support a condemnation of the route abandonments.
 
 
 98
 Finally, we note a document headed "Chunks" (but not, so far as we can discern, traced to any specific Eastern or Texas Air executive). Appellees' App. 74-77. The memo lists eight possible gambits, such as "Redirectionalize [sic] Atlanta, reduce to less than 300 departures," and "Sell Air-Shuttle." For each it includes "Pros" and "Cons," which appear to be framed largely in economic terms, but in some cases mentioning special concern with unions (e.g., reference to "[h]igh seniority, militant workforce"). It also rates each possible move for "Visibility" and "IAM impact." Ratings for "IAM impact" run from "low" to "modest" to "high" to "very high" to "maximum." Eastern's counsel at oral argument suggested that rather than showing either general anti-union animus or any forbidden intent to intimidate, the Chunks memo demonstrates only an intent to engage in "consciousness-raising"--driving home to IAM the implications of conduct that Eastern regards as intransigent. We finesse the point. The Chunks memo lists closing the Kansas City hub as one of the options, but gives it almost the lowest rating for "IAM impact"--to wit, "modest," and states as its big "Pro" "Marginal Economics--Big Losses!" Thus the memo suggests that whatever the temptations to go for "IAM impact," Eastern in fact chose to go for direct avoidance of losses. Again, the evidence misses the crucial link between forbidden intent and conduct. Quite rightly, we think, the district court did not rely on the memo.
 
 
 99
 * * *
 
 
 100
 * * *Plaintiffs contend that this circuit "has never applied the Wright Line analysis in transfer-of-work cases." Appellees' Brief 39 n. 35. This is true only in the sense that we have found no work transfer case in the circuit that discusses the application of Wright Line at all. But we think plaintiffs have a point. Work transfer issues do not lend themselves to application of Wright Line, because the employer's motives are likely to be even more entangled than in the ordinary unfair labor practice case. The firm ordinarily wishes to make more money (or lose less) by shifting work to branches that are low-cost (non-union) from ones that are high-cost (union). To ask the fact-finder to determine whether management acted for innocent economic motives is to put an unanswerable question.
 
 
 101
 Thus our conclusion on work transfer does not depend on our view that Wright Line may generally be applied to claims under Sec. 2 Third and Fourth of the RLA. It depends simply on our conclusion that the record clearly fails to show (1) any material work transfer in the September cutbacks themselves, in the sense of any objective fact of Eastern turning traffic over to Continental, or (2) any probability that material work transfer (in the same objective sense) will ensue.
 
 Downsizing
 
 102
 In support of its inference of anti-union bias, the district court relied upon a series of statements of Eastern or Texas Air officials indicating an intent to "downsize," to sell assets, or to "shrink" until the unions acquiesced in proposed wage reductions. Mem.Op. at 22. The following statements fall into this category. Corporate minutes of Eastern quoted Phil Bakes as saying:
 
 
 103
 [R]eviewed the current situation of labor agreements with the Company's three unions and the likely course of negotiations with the IAM. He noted disruption from union activities, the Company's poor financial performance and continuing revenue and yield problems. He stated that the Company may not be able to down-size piecemeal and cut overhead efficiently and that as a prudent course of action, it was looking at disposing of whole segments of the airline.
 
 Id. at 20. Later, in Falcon, Bakes said:
 
 104
 The long-term answer to Eastern's problem is a revamped labor cost structure. Lacking that, further reductions and restructuring may be necessary.... If improved financial performance cannot be achieved by operating the assets, we will consider selling assets ... other ways must be found to position Eastern's assets to provide a financial return.
 
 Id. at 20-21. And, still later:
 
 105
 Selling assets isn't a threat--that's been clearly demonstrated by 1987's aircraft sales and more recently, the Texas Air subsidiary's acquisition of the Air Shuttle. It's a very real situation that will continue and that Eastern people must be prepared to face.
 
 
 106
 Id. at 21. And a Texas Air vice president also observed that Eastern must "shrink":
 
 
 107
 Eastern has made the decision, if it can't get its costs restructured, it will allow its operation to shrink. It will sell assets as necessary to either continue to fund the remainder of its operation or to retire its debts.
 
 
 108
 In that respect, the departure of pilots saves on furlough pay and other things.
 
 
 109
 It is a nice, orderly way to allow the airline to shrink.
 
 
 110
 Id. at 22. The district court read these, especially the last, as representing a view that there was "no rational economic stopping point to Eastern's strategy of shrinkage until the unions acquiesced." Id.; see also id. at 46 (inferring that by means of the furlough "Eastern wants to show its employees that no union can stop it").
 
 
 111
 First, it seems plain that lopping off unprofitable routes cannot violate Sec. 2 Third and Fourth merely because management hopes that it will pressure unions and their members into accepting its view of Eastern's economic problems. In United Auto Workers v. NLRB, 765 F.2d 175 (D.C.Cir.1985), Judge Edwards rejected a parallel claim under the NLRA. The employer had given tentative notice of an intention to relocate for economic reasons and simultaneously requested midterm contract concessions. The union argued that such a combination violated Sec. 8(d) of the NLRA, which bars a party to a collective bargaining agreement from altering contractual terms concerning mandatory subjects of bargaining during the life of the agreement without the consent of the other party. The theory clearly presupposed that consent secured by economic pressure could not meet Sec. 8(d)'s requirement. Judge Edwards could find "no support" for the union's theory, id. at 183, and stated more generally that the union could cite no precedents for its thesis that " 'an employer or a union that uses economic pressure in the mid-term of a contract to force bargaining over or agreement on such a modification commits an unfair labor practice,' " id. at 184.
 
 
 112
 While of course NLRA precedents may not be casually transferred to the RLA context, Chicago & North Western Ry. Co. v. United Transp. Union, 402 U.S. 570, 579 n. 11, 91 S.Ct. 1731, 1736 n. 11, 29 L.Ed.2d 187 (1971), plaintiffs identify no reason why the latter requires us to cast a more jaundiced eye on efforts to exert economic pressure than the former.
 
 
 113
 In UAW, to be sure, it was stipulated that there was no anti-union animus, and Judge Edwards carefully qualified his opinion in that light. 765 F.2d at 184. Here claims of anti-union animus abound. But it was obviously inherent in Judge Edwards's analysis in UAW that an employer may exercise its legitimate rights under an agreement, with the deliberate purpose of exerting economic pressure, without being ipso facto condemned as manifesting anti-union animus. Thus, insofar as plaintiffs rest their claim of unlawful motivation on evidence of intent to pressure the unions, UAW stands squarely against them.
 
 
 114
 Moreover, in a case where under the Wright Line principle the employer's acts are amply motivated by innocent economic motives, we believe that UAW's acceptance of the purpose of exerting economic pressure should still apply even if there is generalized union hostility in the background. Any other rule would defeat the Wright Line-Mt. Healthy concept that parties should not be allowed to bootstrap themselves into invulnerability.
 
 
 115
 Second, the possibility that one "shrinkage" may be followed by another, and another, until Eastern has ceased to exist, does not transform a lawful furlough into a total cessation of company operations. Plaintiffs contend that any shrinkage (at least in a context of intent to exert economic pressure) must be viewed as a "salami tactic" design to bring about a forbidden extinction of the employer, slice by slice. At oral argument, the unions invoked United Indus. Workers of the Seafarers Int'l Union v. Board of Trustees of Galveston Wharves, 351 F.2d 183 (5th Cir.1965), in support of the idea that such behavior was unlawful. Galveston Wharves indeed held that a firm's lease of an operation, comprising an entire class of work, to an independent outside party was an unlawful termination of the employer's contract with the union, and, under the RLA, a "major dispute." But plaintiffs' theory telescopes the present reduction with a whole series of speculative future Eastern reductions, all speculatively terminating the company. This telescoping is radically at odds with Galveston Wharves's analysis. The court there explicitly noted that the lease "was not, and cannot even remotely be justified as a 'lay-off' (see note 17, supra [noting contract provision for seven days' notice for lay-offs]." Id. at 189. By contrast, the present furlough fits handily within the scope of those permitted by the relevant agreements and practices. Speculation as to a whole series of possible future similar acts cannot deny it that character. See also ALPA v. Transamerica Airlines, Inc., 817 F.2d 510, 512 (9th Cir.) (allegations that airline ceased all operations and permanently furloughed all pilots, and its parent "establish[ed] a separate subsidiary to operate in [the original airline]'s marketplace" held to state claim under Sec. 2 Third and Fourth), cert. denied, --- U.S. ----, 108 S.Ct. 451, 98 L.Ed.2d 391 (1987); Ruby v. TACA Int'l Airlines, S.A., 439 F.2d 1359 (5th Cir.1971) (airline's shift of pilot base from New Orleans to El Salvador, which (at the time) forbade collective bargaining, under wholly spurious carrier justification, violates Sec. 2 Fourth).
 
 
 116
 We do not see that the combination of these elements--exercise of a right to furlough employees as part of an elimination of unprofitable operations, together with explicit suggestions that the process may go on indefinitely in the absence of wage concessions--renders Eastern's conduct any more a violation of Sec. 2 Third and Fourth than they are separately. To say that the combination is fatal would require a company in Eastern's position either to abandon any effort to staunch the flow, or at least to conceal its view of the company's long term prospects. Such a concept would be a cancer in the bargaining process. As Judge Edwards wrote in UAW, "The freedom to suggest exchanges of rights permits parties to adapt their relationship to unanticipated events or changed circumstances during the lifetime of a contract, thus keeping the collective bargaining process vital and responsive to both sides' needs." 765 F.2d at 184. Accordingly, we reject the claim that Eastern may not couple the amputation of its most injured limbs with candor as to where the process will end and what measures are (in management's view) necessary to arrest it. See also NLRB v. Gissel Packing Co., 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969) (employer free to "make a prediction as to the precise effects he believes unionization [or, presumably, specific union bargaining positions] will have on his company," so long as it is "carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control").
 
 Deliberate Bleeding of Eastern
 
 117
 The district court listed several financial transactions that took place among Texas Air and its subsidiaries and labelled them as "suspect." Mem.Op. at 13. It mentioned these financial arrangements "simply because they aggravate ... the financial plight of which Eastern complains--but at the same time they are of Eastern's own making." Id. at 16. Were we to find that Eastern's financial distress was part of a plan by Texas Air and its subsidiaries to create a crisis and justify anti-union actions, we doubt whether Wright Line would be applicable: where the innocent purposes justifying an act under Wright Line are themselves the product of actionable conduct, the premises of Wright Line would be missing. The evidence in the record, however, does not establish that Eastern implemented a plan to deliberately "bleed off" Eastern's assets, much less that any such plan could have played a material role in justifying the September cutbacks.
 
 
 118
 The financial arrangements noted by the district court include the fact that Texas Air partially financed its purchase of Eastern with some of Eastern's own assets (an increasingly common technique often called a "boot-strap" acquisition); Eastern's receipt from Texas Air of a non-interest-bearing demand note for $16 million that is still outstanding despite Eastern's financial difficulties; the $6 million management fee paid annually by Eastern to Texas Air; Eastern's purchase of an unsecured $25 million note from People Express, a subsidiary of Continental; and various other transactions between the affiliated companies. Regardless of the district court's suspicion with regard to these arrangements, other factual findings in the opinion indicate that it did not regard these as attempts to deliberately destroy Eastern or to cause a crisis of sufficient magnitude to warrant the proposed furlough.
 
 
 119
 The court initially observed that although it is troubled by these financial arrangements, "the total amount involved is not at all large, in view of Eastern's total capital structure." Id. at 13. In light of the evidence presented by the union's own expert that Eastern needed a minimum of $300 million in cash to operate, Appellant's App. II-221-22, the scope of these transactions seems modest. Moreover, the transactions have no relation whatsoever to the $99-119 million of losses attributable to the service that Eastern has dropped and that at bottom provide the "sound financial reasons" (Mem.Op. at 28) underlying the schedule changes. The record does not support a finding that in the absence of the transactions Eastern would have faced a materially different business problem.
 
 
 120
 In any event, there is little to support a conclusion that the transactions are questionable. The most persuasive evidence concerning them is the Preliminary Investigation of Texas Air Corporation and its Subsidiaries undertaken by the Department of Transportation and submitted to the Secretary on May 25, 1988. Appellant's App. I-267-420. 30 lawyers, economists, investigators, and industry analysts interviewed union and company officials, reviewed financial records, and received information from all interested third parties with the following goal:
 
 
 121
 to determine whether Eastern and Continental possess the elements of economic fitness: (1) competent management teams with the managerial skills and technical ability necessary to provide air transportation, (2) financial resources sufficient to allow them to operate without undue risk to the public, and (3) the disposition to comply with all applicable legal requirements.
 
 
 122
 Id. at I-271. The Report analyzed in detail each of the transactions indicted in the district court's opinion, and it specifically analyzed them to discover whether Texas Air was diverting substantial funds and other resources from some subsidiaries to others. Id. at I-299.
 
 
 123
 For example, the district court questions the legitimacy of a "$100 million unsecured note, due in 2012, subordinated to all other notes," that Eastern received from Texas Air in return for the sale of two of Eastern's computer subsidiaries. Mem. Op. at 16. The Department of Transportation Report analyzed this entire transaction, primarily to determine if the valuation of the computer subsidiaries was accurate and fair, appearing to conclude that it was. Appellant's App. I-328-30. It described the note used to purchase the subsidiaries as a "callable $100 million convertible subordinated debenture of Texas Air that bears 6 percent interest." Id. at I-328. The Report did not question the legitimacy of this note or the financial wisdom of Eastern's decision to accept it as consideration. In fact, when it listed the several advantages of the transaction for Eastern, it mentioned "the interest income on the note." Id. As a whole, the Department of Transportation Report appears to have found no evidence of a design to deliberately bleed off assets of Eastern. Noting, however, that the DOT study was conducted for another purpose, we do not place significant reliance on it.
 
 
 124
 Neither the district court's findings nor the Department of Transportation study can support the unions' allegations that Eastern violated Sec. 2 Third and Fourth by executing a deliberate plan to bleed off Eastern's assets.
 
 General anti-union animus
 
 125
 Eastern and Texas Air officials have certainly expressed at least exasperation with Eastern's unions. The district court gathered a number of these remarks, almost all of which we have already quoted in considering the work-transfer and downsizing theories. The material one that we have not yet quoted is the following statement of Frank Lorenzo to Eastern's pilots on December 2, 1986:
 
 
 126
 There are some of [you] who might not be familiar with my feelings on unions and associations. I would not have made the comments three or four years ago that I am about to say now. I have been involved with this company for 15 years, and I have seen it both ways. It has not been until the last three years that I have truly understood how difficult and how bad a union environment is and how it weakens the position of the employees over the long term.
 
 
 127
 Mem. Op. at 19. We will assume without deciding that the district court could without clear error characterize some or all of these remarks as manifesting anti-union animus.
 
 
 128
 As we have explained above, however, the plaintiffs' general attack on the September cutbacks as manifesting such animus, and thus illegal under Sec. 2 Third and Fourth, is subject to analysis under Wright Line. The district court's clearly correct finding that Eastern's operational changes were "motivated by sound financial reasons" establishes, under Wright Line, a sufficient and independent innocent motivation.
 
 
 129
 We also have identified two specific aspects of plaintiffs' charges for which a Wright Line analysis appears unsuitable--work transfer and "bleeding." Plaintiffs lose on those without regard to Wright Line: on the first because the necessary objective facts of work transfer (or its prospect) have not been shown, on the second because the alleged "bleeding" (even if it were properly so labelled) is palpably insufficient to undermine the legitimate business reasons underlying the September cutbacks.
 
 
 130
 What remains, then, is a claim of generalized, free-floating anti-union animus. Application of Wright Line neutralizes it, for want of adequate causal connection to Eastern's actions. Moreover, with respect to generalized anti-union animus, application of Wright Line is peculiarly suitable, as the causal link that plaintiffs must establish is inherently weak in such a case. As the Fifth Circuit has observed in the discharge context, long before Wright Line, a "general bias or a general hostility and interference.... does not supply the element of purpose. It must be established with respect to each discharge." NLRB v. Dan River Mills, Inc., 274 F.2d 381, 384 (5th Cir.1960), quoted in Florida Steel Corp. v. NLRB, 587 F.2d 735, 744 (5th Cir.1979); see also Weather Tamer, Inc. v. NLRB, 676 F.2d 483 (11th Cir.1982) (decision to relocate operations found not to be discriminatory labor practice in violation of Sec. 8(a)(3), despite its occurrence in midst of election campaign in which employer made many statements simultaneously found illegal under Sec. 8(a)(1)).
 
 
 131
 Application of the Wright Line principle to statements allegedly manifesting general anti-union animus appears particularly critical where labor-management relations have featured deep mutual animosity and expressions of hostility. Otherwise each party might be inclined to provoke hostile remarks by the other, with the purpose and effect of stultifying the other's ability to take legitimate steps. A court might try to control that by seeking to identify "the aggressor" or to assign fault; but the effort would entangle it in ancient antagonisms of doubtful relevance to the immediate dispute.
 
 
 132
 The relations between Eastern and the unions exemplify the difficulty. Management's expressions of exasperation over what it claimed was union intransigence came in a context of rather intense union denunciations of Eastern. In an open letter to IAM members dated March 12, 1982, for example, Charles E. Bryan, the President and General Chairman of the union, wrote,
 
 
 133
 Most of Eastern Air Lines labor relations energy has been directed at dividing the union membership and trumping up phony charges against local union leadership in order to discredit our organization.
 
 
 134
 The unscrupulous August 14, 1981 teletype from Vice President Amos regarding the company's 50% pay cut proposal ... is a classic example of the company's total departure from the truth. How can anyone be expected to do business with, deal with, negotiate with or even have a conversation with a management who resorts to such unethical tactics?
 
 
 135
 Appellant's App. II-429.
 
 
 136
 Later bulletins employed similar language. For example, in January 1985 a publication noted that a "treacherous act" by Eastern's management "constitutes a total absence of credibility," id. at II-424, and another IAM Bulletin published a few days later announced that "[n]ot one honest person in Eastern Air Lines management Believes In Their [sic] Heart That They [sic] Are Right About This Dispute" and cited the "treachery and absence of principle" exhibits by Eastern's management, id.
 
 
 137
 Another IAM Bulletin, dated January 21, 1986 and captioned "Post on All Bulletin Boards," informed readers that
 
 
 138
 [i]n order to achieve his goals of reducing labor costs, over the past 10 years Frank Borman has engaged in a continuous program of traumatic and oppressive labor strategies.There is no indication that the present Top Management of Eastern has any intention of ever withdrawing from this harsh and cruel labor game plan.
 
 
 139
 Id. at II-445.
 
 
 140
 On February 8, 1988 high ranking IAM officials proposed a plan to coordinate their efforts to attack Eastern's management. An internal memo suggested that the union
 
 
 141
 [m]ake Frank Lorenzo the issue--personalize the conflict to one between him (i.e., the man who's the pillager of the American Dream; the man who would cut any corner to make a buck; the man who's a brutal, unscrupulous corporate autocrat) and us (ordinary working people, fathers and mothers; people just like you and your neighbors).
 
 
 142
 Id. at II-230. The memo goes on to urge that the unions
 
 
 143
 [e]xert financial pressure on Lorenzo by frustrating his plans, ... and engendering uncertainty and (hopefully) panic in the camp of his financial backers and others whose help or cooperation he needs.
 
 
 144
 Id. at II-230.
 
 
 145
 Similarly, we note that when the Federal Aviation Administration investigated 1700 safety allegations submitted by members of ALPA, it found that only six appeared to contain allegations of regulatory violations. Id. at I-347.
 
 
 146
 It seems fair to say that tact and courtesy were not the hallmarks of discourse between Eastern and its unions. Failure to apply Wright Line to general expressions of anti-union animus would surely encourage union officials to attack in the hope of provoking responses in kind and of thereby securing a veto over management steps--even those justified and motivated by legitimate business concerns.
 
 
 147
 * * *
 
 
 148
 * * *
 
 
 149
 We reject the suggestion that the expiration of collective bargaining agreements between Eastern and ALPA and IAM, plus the filing of Sec. 6 notices, require us to classify the dispute between Eastern and those unions as major under the Railway Labor Act. With respect to all three unions, the terms of the various collective bargaining agreements and the parties' settled past practice compel the conclusion that the dispute over the September furlough is a minor one. Accordingly, the district court was without jurisdiction to enter a preliminary status quo injunction under Sec. 6 of the Act.
 
 
 150
 Moreover, the present record does not substantiate the allegations that Eastern has violated Sec. 2 Third and Fourth of the RLA.
 
 
 151
 We therefore reverse the district court's judgment and dissolve, without condition, the preliminary injunction that prohibited Eastern from implementing the furlough. As the time for adducing evidence on the matters within the district court's jurisdiction was short in the preliminary injunction context, we remand the claims under Sec. 2 to the district court so that it may receive such evidence and entertain such claims for permanent injunctive relief as plaintiffs may choose to present. We dismiss the petition for mandamus as moot.
 
 
 152
 So ordered.
 
 
 153
 Before WALL, Chief Judge, and ROBINSON, MIKVA, EDWARDS, RUTH BADER GINSBURG, STARR, SILBERMAN, BUCKLEY, WILLIAMS, D.H. GINSBURG* and SENTELLE, Circuit Judges.
 
 
 154
 ON APPELLEES' JOINT SUGGESTION FOR REHEARING EN BANC
 
 ORDER
 
 155
 Appellees' joint suggestion for rehearing en banc has been circulated to the full Court. The taking of a vote thereon was requested. Thereafter, a majority of the judges of the Court in regular active service did not vote in favor of the suggestion. Accordingly, it is
 
 
 156
 ORDERED, by the Court en banc, that the suggestion is denied.
 
 
 157
 A dissenting statement of Circuit Judge MIKVA, joined by Chief Judge WALD and Circuit Judges SPOTTSWOOD W. ROBINSON, III, and HARRY T. EDWARDS, is attached.
 
 
 158
 Separate concurring statements of Circuit Judges RUTH BADER GINSBURG, STARR, SILBERMAN and STEPHEN F. WILLIAMS are also attached.
 
 
 159
 MIKVA, Circuit Judge, with whom WALD, Chief Judge, and SPOTTSWOOD W. ROBINSON, III, and HARRY T. EDWARDS, Circuit Judges, join, dissenting from the denial of the suggestion to hear the case en banc:
 
 
 160
 This case convinces me that we should install a witness stand and a jury box in the courtroom of this court of appeals. The panel's own findings of fact are so extensive, and revise the district court's conclusions so completely, that they do genuine violence to the deference we owe to the determinations of our fellow judges on the district court. The panel apparently thought that justice required it to allow Eastern's management to extricate itself from a financial morass largely of its own making; to achieve that result, the panel has rushed headlong into the complexities of the Railway Labor Act ("RLA") and has transplanted an inapposite doctrine from the National Labor Relations Act ("NLRA") into the specialized context of the RLA. This transplant occurred even though the district judge never considered the doctrine applicable. In addition, the panel has cut a huge swath into the "status quo" doctrine of section 6 and created a square conflict with two of our sister circuits. Given all that baggage, I would grant the petition to rehear the case en banc.
 
 I. THE DISTRICT COURT'S FINDINGS OF FACT
 
 161
 The district court issued an injunction after finding that large-scale employee furloughs were part of a coercive, anti-union strategy adopted by Eastern as part of its effort to avoid collective bargaining in violation of the RLA, section 2, Third and Fourth, 45 U.S.C. Sec. 152, Third and Fourth. The district court formed its conclusion after hearing testimony for seven days from many of the major players in the transaction and after reviewing a wide variety of exhibits and declarations, see district court memorandum opinion ("Mem. op.") at 3.
 
 
 162
 The district court found as a matter of fact that Eastern sought to lower its labor costs by intimidating its unions, the Air Line Pilots Association ("ALPA"), the International Association of Machinists ("IAM"), and the Transport Workers Union ("TWU"). "The clear and obvious targets of Eastern's downsizing [were] Eastern's unions and their collective bargaining agreements," and Eastern intended to continue to downsize its operations beyond any "rational economic stopping point * * * until the unions acquiesced." Mem. op. at 22. "By walking away from the bargaining table and unilaterally furloughing 4,000 employees," and by "singlehandedly terminat[ing] these jobs without negotiation," Eastern "wants to show its employees that no union can stop it." Mem. op. at 46. It thereby hoped to win wage concessions from its frightened work force. The airline "is sending a very clear message" to its remaining workers that their unions "are powerless to protect [them]." Mem. op. at 44.
 
 
 163
 In addition, Eastern, together with Texas Air and Continental, also intended to transfer "assets, work and work opportunities" to Continental so that "Continental's total work force of non-union, pilots, ground services personnel, and flight attendants [would] outnumber[ ] Eastern's." Mem. op. at 17. This was done in part to reduce costs but also to ensure that if a pending National Mediation Board ("NMB") certification election found that Texas Air/Continental/Eastern were a single carrier, it would have a work force where non-union employees would outnumber their union counterparts. Mem. op. at 18. In contrast, the district court found that there was no illegal union conduct to diminish or offset the legal effect of the unions' claims. Mem. op. at 22-24.
 
 
 164
 The panel rejects outright the careful fact-finding of the district judge and, paying only lip service to the "clearly erroneous" standard of Fed.R.Civ.P. 52(a), "reverse[s] the finding of the trier of fact simply because it is convinced that it would have decided the case differently." Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). An administrative agency would have received more deference than did the district judge in this case. For example, the panel dismisses statements by Eastern officials that the targets of its downsizing strategy were the unions. David Kuntsler, Eastern's Vice President for Planning, warned that if no "labor resolution" were reached, Eastern would continue to sell aircraft. Mem. op. at 21. On the day the furloughs were announced, Kuntsler cautioned the unions that "until we restructure our labor costs * * * then really almost everything has to be for sale." Mem. op. at 22. Similarly, Robert Ferguson, a Texas Air Vice President, emphasized that the strategy would continue: "Eastern has made the decision, if it can't get its costs restructured, it will allow its operation to shrink. It will sell assets as necessary * * *." Mem. op. at 22.
 
 
 165
 The panel finds that these statements are not evidence of a specific anti-union plan, characterizing them instead as merely "generalized union hostility in the background." Supra at 909. The panel rejects as "speculative," supra at 909, the district court's conclusion that the shuttle spin-off, repeated transfer of assets and opportunities out of Eastern, and the proposed cutbacks were all part "of Eastern's strategy of shrinkage until the unions acquiesced." Mem. op. at 22.
 
 
 166
 The panel also discounts the numberous instances of work transfer from Eastern to the less unionized Continental, but it misses the forest for the trees. The district court pointed to an extensive pattern of transfers of Eastern assets and corporate opportunities, and documented a series of suspicious financial transactions within the corporate family. The lower court found that "Texas Air offered available growth opportunities to Continental rather than Eastern." Mem. op. at 10. Eastern, meanwhile, was left to wither on the vine. A parent, of course, may prefer one corporate affiliate to another as a matter of business judgment. But in this case, the district court found that "[t]he coordination of efforts was generally for purposes of assisting [less unionized] Continental and frustrating the collective bargaining representatives of Eastern's employees." Mem. op. at 10. The withdrawal from Kansas City was part and parcel of this strategy to weaken Eastern.
 
 
 167
 In short, the panel simply declines to accept those findings of the trial judge with which it disagrees. The district court found as a matter of fact that Eastern's actions were designed to "avoid and reduce labor costs under the existing bargaining agreements; force Eastern employee groups to accept further cuts in wages and benefits, and undermine the unions' exclusive representative status." Mem. op. at 18. The panel rejects this view and substitutes instead its own conclusion that Eastern's statements of anti-union animus lacked "adequate causal connection to Eastern's actions." Supra at 912 (emphasis in original).
 
 
 168
 Since I was not even an original panel member in this case, I am not in a position to judge for myself what the facts really are. But I do know which court was in the best position to decide.
 
 II. THE Wright Line TEST
 
 169
 The panel acknowledges the Supreme Court's admonition that "of course NLRA precedents may not be casually transferred to the RLA context," supra at 909, but it then proceeds to do exactly that--to apply Wright Line to a large-scale corporate restructuring under the Railway Labor Act. I have grave doubts whether the Wright Line test is appropriate here. I have no doubt that its application for the first time on appeal and in the manner used by the panel is totally inappropriate.
 
 
 170
 In Wright Line, 251 N.L.R.B. 1083 (1980), enf't granted, NLRB v. Wright Line, 662 F.2d 899 (1st Cir.1981), cert. denied, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), the National Labor Relations Board ("NLRB") developed a two-part test to determine whether an employer committed an unfair labor practice by terminating a union activist who was also an unsatisfactory employee. This approach was confirmed in NLRB v. Transportation Management Corp., 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), where the Supreme Court ruled that the NLRB General Counsel has the burden of persuading the Board by a preponderance of the evidence that anti-union animus contributed to an employer's decision to discharge an employee, and that an employer can avoid the conclusion that it violated the NLRA by proving by a preponderance of the evidence that the employee would have been fired for permissible reasons even if he had not been involved in protected union activities. Once the General Counsel carries the burden of proving the elements of an unfair labor practice, the employer carries a significant burden of proof to show that the alleged unlawful action would have occurred in any event for valid reasons. "It is fair that [the employer] bear the risk that the influence of legal and illegal motives cannot be separated, because he knowingly created the risk and because the risk was created not by innocent activity but by his own wrongdoing." 462 U.S. at 403, 103 S.Ct. at 2475.
 
 
 171
 Even if Wright Line were the correct legal standard to apply in the RLA context, the panel errs by not remanding this case for application of the Wright Line standard by the district court. The district judge cited neither Wright Line nor Transportation Management. Mem. op. at 44-46. Indeed, only on appeal did Eastern persuade the court to view the case as a mixed-motive employee termination case through the Wright Line lens. The panel should have remanded the case for additional fact-finding; "it should not simply have made factual findings of its own." Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714, 106 S.Ct. 1527, 1530, 89 L.Ed.2d 739 (1986); see Pullman-Standard v. Swint, 456 U.S. 273, 291-93, 102 S.Ct. 1781, 1791-92, 72 L.Ed.2d 66 (1982). Eastern was obliged to shoulder a significant burden of proof with respect to its affirmative defense, and also bore the risk that the permissible and impermissible motives could not be separated. This burden was never even attempted at the trial level. The panel's generosity to Eastern is accomplished through wholly improper appellate procedure.
 
 
 172
 The panel seizes upon two sentences in the lower court opinion in which the district judge stated that the operational changes proposed by Eastern were motivated by "sound financial reasons" and that "Eastern has legitimate and compelling business reasons to withdraw from the Kansas City hub." Mem. op. at 28. These two sentences, however, hardly amount to a "finding" by the district court that Eastern would have made the same decision in the absence of anti-union animus, particularly under the burden of proof mandated by Transportation Management. The panel attempts to twist this short statement of the district judge into something it is not, by isolating it from the rest of the opinion, including the 20 pages of "Findings of Fact" (the two sentences on which the panel dwells did not appear in the "Findings of Fact" section of the district court opinion) which detailed the numerous instances of anti-union conduct by Eastern. The panel's argument that the word "compelling" in the district court opinion automatically translates into a finding of "independent and sufficient motive," supra at 903, is semantic sophistry. The panel's obsession with these two short sentences and its attempt to read them out of context to fit its own conclusions betray a remarkable disrespect for the district court.
 
 
 173
 I doubt, however, whether Wright Line is even the appropriate test here. The court of appeals in that case cautioned that its approach was inapplicable to "a challenge to an overall policy of the employer rather than to a single discharge." 662 F.2d at 904 n. 8. This counsel is wise, and the panel has overlooked it.
 
 
 174
 There is a great difference between an individual employee's discharge and a massive restructuring of the work force. In the former case, if one employee is fired, another is usually hired to take his place. Thus, there are no overriding elements of corporate strategy at stake, and the task for a reviewing court, while by no means always easy, involves a more straightforward determination as to whether the employee would have been fired in any case for behavior unconnected with his participation in protected activities. There is usually an employee manual or collective bargaining agreement to which a court can refer to determine what type of activities are "dischargeable offenses," see, e.g., Wright Line, 662 F.2d at 901, and there is often a history of employee terminations to which a court can compare the instant case, see, e.g., NLRB v. Transportation Management Corp., 462 U.S. 393, 397, 404, 103 S.Ct. 2469, 2472, 2475-76, 76 L.Ed.2d 667 (1983).
 
 
 175
 When a mammoth corporate restructuring is at stake, it is a different matter. The counterfactual inquiry of what the employer would have done in the absence of anti-union animus is difficult to resolve and often clouded by a multitude of post hoc rationalizations. In addition, there is no "usual practice," Transportation Management, 462 U.S. at 404, 103 S.Ct. at 2475-76, by reference to which a reviewing court can judge the propriety of the transaction. How many other times has Eastern closed its Kansas City hub or furloughed 12 percent of its work force? Although employers and unions can point to other "comparable" moves in the past, each transaction is really sui generis. The Wright Line test crumbles in this context, and the practical import of the panel's rule is to say that so long as the proposals of the employer will save money, anything goes.
 
 
 176
 The Supreme Court has endorsed a different approach. It has warned that if a corporate transaction is motivated by more than an insignificant anti-union purpose, then it is illegal, regardless of the arguments that can be mustered to justify the move financially. "An employer may not simply shut down part of its business and mask its desire to weaken and circumvent the union by labeling its decision 'purely economic.' " First National Maintenance Corp. v. NLRB, 452 U.S. 666, 682, 101 S.Ct. 2573, 2582, 69 L.Ed.2d 318 (1981); see Textile Workers v. Darlington Manufacturing Co., 380 U.S. 263, 275, 85 S.Ct. 994, 1002, 13 L.Ed.2d 827 (1965); cf. International Union, UAW v. NLRB, 765 F.2d 175, 178, 184 (D.C.Cir.1985) ("Milwaukee Spring ") (upholding NLRB finding of no unfair labor practice where employer relocation was neither an attempt to obtain lower wage rates nor motivated by anti-union animus).
 
 
 177
 Finally, even if Wright Line were the appropriate standard for large-scale corporate transactions under the NLRA, I am doubtful whether it can be transplanted to the RLA context. "It is by now almost axiomatic that NLRA and RLA cases are not freely interchangeable, as the two statutes have distinctly different histories and different approaches to the problem of labor management relations." Railway Labor Executives' Association v. Pittsburgh & Lake Erie Railroad Co., 845 F.2d 420, 429 (3d Cir.1988). In particular, the RLA envisions a much greater role for unions in decisions to scale back operations, see First National Maintenance Corp., 452 U.S. at 686 n. 23, 101 S.Ct. at 2585 n. 23; Railroad Telegraphers v. Chicago & North Western Railway Co., 362 U.S. 330, 339-40, 80 S.Ct. 761, 766, 4 L.Ed.2d 774 (1960). The aim of the RLA is to resolve disputes not through unilateral action but by collective bargaining and thereby to "promote peaceful relationships between the carriers and their employees [and] prevent interruptions of transportation." S.Rep. No. 606, 69th Cong., 1st Sess. 3 (1926). Eastern's "furlough first, talk later" approach thwarts this special RLA policy and should not be scrutinized according to Wright Line or any other NLRA standard. Instead, the panel should have applied the test followed in other RLA cases that an "[a]nti-union motivation invalidates even a discharge which could be justified on independent grounds." Air Line Pilots Association v. United Air Lines, Inc., 802 F.2d 886, 900 (7th Cir.1986) (quoting Conrad v. Delta Air Lines, Inc., 494 F.2d 914, 918 (7th Cir.1974)), cert. denied, 480 U.S. 946, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).III. THE STATUS QUO REQUIREMENTS
 
 
 178
 The district court's injunction rested independently on RLA section 6, 45 U.S.C. Sec. 156, which protects collective bargaining by requiring the parties to maintain the status quo on "major" issues while bargaining about a new contract proceeds. It is of course implausible on its face to assert, as the panel does, that the largest furlough in Eastern's history, undertaken at a time of unprecedented bitterness in labor-management relations and affecting thousands of employees, is not a major dispute. The whole purpose of the RLA is to prevent inflammatory unilateral actions by either side that threaten to disrupt national transportation. Indeed, the Supreme Court has found similar disputes to be major even when they have occurred within the context of existing collective bargaining agreements. See Railroad Telegraphers v. Chicago & North Western Railway Co., 362 U.S. 330, 341, 80 S.Ct. 761, 767, 4 L.Ed.2d 774 (1960). This dispute is made even easier to analyze as "major" by the fact that there was no collective bargaining agreement in effect between Eastern and IAM, and Eastern and ALPA, at the time of the cutbacks.
 
 
 179
 The district court found that Eastern was involved in collective bargaining negotiations with IAM and ALPA over contract proposals directly related to Eastern's restructuring plan when that plan was announced on July 22, see Mem. op. at 34. Eastern and IAM served section 6 notices on October 2, 1987, in which both parties indicated their intention to negotiate changes to their collective bargaining agreement. The two had been negotiating since January 1988 under the mandatory auspices of the NMB, see Mem. op. at 34. Eastern and ALPA served section 6 notices on May 31, 1988, in which both parties proposed the renegotiation of all rates of pay, rules, and working conditions for the Eastern pilot group, see Mem. op. at 33-34. Eastern and ALPA met to engage in collective bargaining over new contract proposals on June 21, 1988, July 6, 1988, and July 22, 1988, and exchanged written contract proposals on July 6 and 7, 1988, see Mem. op. at 34.
 
 
 180
 Precisely this kind of situation has led two of our sister circuits to characterize as "major disputes" disagreements which were the subject matter of new bargaining after the expiration of the old agreement. See IAM v. Aloha Airlines, Inc., 776 F.2d 812, 816 (9th Cir.1985); Air Cargo, Inc. v. Local Union 851, 733 F.2d 241,245-46 (2d Cir.1984). In both these cases, courts issued injunctions to prevent the alteration of "the actual, objective working conditions out of which the dispute arose," Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union, 396 U.S. 142, 143, 90 S.Ct. 294, 295, 24 L.Ed.2d 325 (1969). The panel rejects this doctrine on the ground that it collapses the "major" and "minor" categories with respect to terms over which the parties are bargaining after the expiration of their agreement. It thus creates a square conflict with these other circuits, which have more faithfully followed congressional intent that neither labor nor management "rock[s] the boat * * * until the procedure of the Railway Labor Act is exhausted." Manning v. American Airlines, Inc., 329 F.2d 32, 35 (2d Cir.), cert. denied, 379 U.S. 817, 85 S.Ct. 33, 13 L.Ed.2d 29 (1964). The two-track procedure is not an end in itself but rather a tool to ensure that the parties settle their disputes through bargaining rather than self-help. The Supreme Court has described the status quo requirement as "central" to the RLA's design because "only if both sides are equally restrained can the Act's remedies work effectively." Shore Line, 396 U.S. at 150, 155, 90 S.Ct. at 299, 302. Eastern has made a sham of the bargaining process by pretending to negotiate, while unilaterally implementing the very changes it had been unable to obtain through collective bargaining. The panel's novel ruling defeats, rather than promotes, the intent of the RLA.
 
 
 181
 The panel is able to reach its conclusion only by ignoring the district court's finding that:
 
 
 182
 "[n]one of Eastern's prior job terminations [is] comparable in scope and breadth to the scheduled furloughs." Mem. op. at 17.
 
 
 183
 The layoffs in the wakes of the 1973 oil embargo, the 1979 oil price increase, airline deregulation, the 1981 PATCO strike, and the recession of the early 1980s, were all responses to exogenous, industry-wide economic shocks. The district court found that furloughs of this scale have never occurred:
 
 
 184
 (1) during collective bargaining with the unions over precisely the working conditions altered by Eastern's conduct, Mem. op. at 5-6, 17;
 
 
 185
 (2) as part of a decision to dismantle the airline and bring Eastern "back to its roots," Mem. op. at 17, 28-35; and
 
 
 186
 (3) as part of an ongoing plan to transfer Eastern work to a non-union corporate affiliate, Mem. op. at 8-10, 17-22.
 
 
 187
 The panel also ignored the district court's finding that the unions, which frequently resisted Eastern's furloughs in the past, Mem. op. at 17, did not demonstrate the "acquiescence" or "mutual understanding" necessary to establish a "past practice," see Shore Line, 396 U.S. at 154, 90 S.Ct. at 301; United Transportation Union Local Lodge No. 31 v. St. Paul Union Depot Co., 434 F.2d 220, 222 (8th Cir.1970), cert. denied, 401 U.S. 975, 91 S.Ct. 1194, 28 L.Ed.2d 324 (1971). The panel's result with respect to this issue, like its other conclusions, can only be reached by rejecting wholesale the findings of fact of the district court.
 
 
 188
 Judge Williams believes that I am suffering from a "clear misconception" because I fail to recognize that the status quo obligation under section 6 was an express premise of the panel's analysis. The disagreement is a matter of semantics. The final version of the panel's opinion rejects the classification of the dispute as "major" and concludes that the dispute before it "is a minor one," supra at 913. This means, of course, that "the courts do not have jurisdiction to issue status quo injunctions," supra at 896, because the System Board has exclusive jurisdiction over minor disputes. The panel may consider section 6 a premise of its argument, but it is a well-buried premise indeed. The panel, after all, prevents the district court from issuing an injunction to preserve the status quo.
 
 CONCLUSION
 
 189
 Oscar Wilde once boasted that he could resist everything except temptation. It is always tempting to adjust the tensions and conflicts in a trial court record according to one's own predilections. But in doing so, the panel has usurped the fact-finding role of the district court; it has rashly transplanted the Wright Line doctrine to the context of large-scale corporate restructurings under the RLA; and it has rejected the considered judgment of two sister circuits regarding the RLA's status quo requirements.
 
 
 190
 This case has spawned, at the en banc stage alone, six separate statements involving eight judges on our court. Four statements have explained why the case should not be reheard en banc, and two have advocated that it be so reheard. There have appeared four different interpretations of how the Railway Labor Act's system for classifying disputes as "major" or "minor" ought to be applied in this case: the panel believes the dispute here is "minor"; Judge Silberman thinks it may be "major," but contends that classifying it as "major" would not alter the outcome of the case; Judge Edwards has proposed that the dispute may be both "major" and "minor"; and I have argued that the dispute is "major" and that this classification would affect the result. There are also divisions among us in our understandings of the appropriate role of the Wright Line test in the context of large-scale corporate restructurings under the Railway Labor Act. These disparate views, it seems to me, suggest that the panel opinion cannot serve as any significant guidepost in this circuit on these difficult and unsettled areas of law.
 
 
 191
 I think the panel opinion sets a very bad precedent and the case ought to be reheard en banc.
 
 
 192
 HARRY T. EDWARDS, Circuit Judge, dissenting from the denial of rehearing en banc:
 
 
 193
 I agree with my colleague Judge Ruth B. Ginsburg that it is only in the "rarest of circumstances" that we should rehear a case en banc. Apart from concerns about the drain on judicial resources, the expense and delay for the litigants, and the risk of a multiplicity of opinions that en banc consideration entails, the commands of judicial collegiality require judges on a circuit to trust one another in the handling of panel dispositions. Nonetheless, "rare circumstances" do occur when en banc consideration is necessary "to secure or maintain uniformity of decisions or when a case involves a question of exceptional importance." Bartlett ex rel. Neuman v. Bowen, 824 F.2d 1240, 1244 (D.C.Cir.1987) (Edwards, J., concurring in the denials of rehearing en banc ). This case presents such a circumstance.
 
 
 194
 The usual justifications for denying en banc review are inapplicable in this case. For one thing, this case presents several legal issues of exceptional importance with respect to questions that are likely to recur in the future. In addition, our mere consideration of whether to rehear this case has insured that which a denial of rehearing en banc seeks to avoid, i.e., a multiplicity of opinions offering no authoritative guidance for either these or future litigants. This latter point is illustrated by the court's handling of the issue of the status quo requirements under the Railway Labor Act ("RLA" or "Act"): the panel's resolution of this issue finds no support in the opinions of the Supreme Court and it adopts a legal position that is flatly at odds with the views expressed by at least two sister circuits; one member of the court finds the panel opinion to be a "correct judgment;" another member of the court declines to sanction the result reached by the panel; yet another member of the court rejects the legal approach adopted by the panel but "would reach the same judgment as did the panel," albeit pursuant to an entirely different line of analysis; and four members of the court reject the legal approach employed by the panel, as well as the result reached. The "law" in this circuit regarding the status quo requirements of the RLA is now in a state of hopeless confusion; in denying rehearing en banc, we have created the chaos that en banc consideration is designed to avoid.
 
 
 195
 Furthermore, there is no principled way to reconcile our denial in this case with our recent decisions to grant the suggestions for en banc consideration in New York Times Co. v. NASA, 852 F.2d 602 (D.C.Cir.1988), reh'g granted en banc, 860 F.2d 1093 (D.C.Cir.1988), and National Treasury Employees Union v. FLRA, 856 F.2d 293 (D.C.Cir.1988), reh'g granted en banc, No. 87-1165 (D.C.Cir. Nov. 23, 1988). I sincerely hope that this court has not reached a point where the decision whether to engage in en banc review rests on "a self-serving and result-oriented criterion." Bartlett, 824 F.2d at 1242. In my view, this case should be reheard en banc to secure uniformity of decisions in this circuit, and to resolve questions of exceptional importance. FED.R.APP.P. 35(a).
 
 
 196
 FINDINGS OF FACT AND THE APPLICABILITY OF THE Wright Line TEST
 
 
 197
 With respect to the District Court's findings of fact and the applicability of the so-called Wright Line test, I concur fully in the separate opinion of Judge Mikva dissenting in the denial of rehearing en banc. I would only add that the panel opinion does not even purport to follow the highly deferential standard of review for findings of fact enunciated in Pullman-Standard v. Swint, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982) and Anderson v. Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). In adhering to Pullman-Standard and Bessemer, recent opinions of this court have rejected litigants' invitations to second-guess district court findings, even when we have strongly disapproved of a trial court's approach to factfinding. See, e.g., Berger v. Iron Workers Reinforced Rodmen Local 201, 843 F.2d 1395, 1407 (D.C.Cir.1988); Southern Pac. Communications Co. v. AT & T, 740 F.2d 980, 984 (D.C.Cir.1984), cert. denied, 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 380 (1985). The panel opinion in this case ignores this line of precedent.
 
 
 198
 The Supreme Court has told us, in no uncertain terms, that under the "clearly erroneous" standard of Federal Rule of Civil Procedure 52(a), "[t]he reviewing court oversteps the bounds of its duty ... if it undertakes to duplicate the role of the lower court." Bessemer, 470 U.S. at 573, 105 S.Ct. at 1511. "[T]he court of appeals may not reverse [the district court] even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Id. at 574, 105 S.Ct. at 1512 (emphasis added). The panel's opinion in this case is nothing short of a "full-scale independent review and evaluation of the evidence," United States v. McConney, 728 F.2d 1195, 1201 (9th Cir.), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984), in direct contravention of the Supreme Court's commands on the subject. In the New York Times case, a majority of this court voted in favor of en banc review on the Government's claim that the panel opinion conflicts with controlling pronouncements of the Supreme Court. This same consideration requires the court to rehear this case en banc.
 
 
 199
 THE APPLICABILITY OF THE "STATUS QUO" REQUIREMENTS OF
 
 SECTION 6 OF THE RAILWAY LABOR ACTCT
 1. Introduction
 
 200
 This case should also be reheard en banc to consider the very important and difficult issues relating to the status quo requirements under section 6 of the Railway Labor Act, 45 U.S.C. Sec. 156 (1987). Section 6 reads, in pertinent part, as follows:
 
 
 201
 Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions.... In every case where such notice of intended change has been given ... rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon....
 
 
 202
 The panel opinion holds that the disputes between Eastern Air Lines and the unions in this case are "minor," not "major," under the Railway Labor Act, supra at 913, so they "must be submitted to an arbitration board for resolution," id. at 895, and, therefore, "the district court was without jurisdiction to enter a preliminary status quo injunction under Sec. 6 of the Act." Id. at 913. The fallacy in this position is that it assumes that major and minor disputes cannot coexist under the Act.
 
 
 203
 The cases here involve three different bargaining situations: Eastern Air Lines ("Eastern") and the Air Line Pilots Association ("ALPA"); Eastern and the Transport Workers Union of America ("TWU"); and Eastern and the International Association of Machinists ("IAM"). The collective bargaining agreement between TWU and Eastern does not expire until December 31, 1988. The Eastern and ALPA and IAM agreements already have expired.
 
 
 204
 2. The Dispute Between Eastern and TWU: The Status Quo Requirement Where the Agreement Has Not Expired
 
 
 205
 As to the Eastern/TWU arrangement, the judgment of the panel is probably correct that the dispute between the parties is only minor. The collective bargaining agreement includes extensive procedures governing the layoff of bargaining unit employees due to reductions in force; I also assume that the agreement contains a procedure for binding arbitration for the resolution of grievances concerning employee rights under the contract. Unless the parties' arbitration procedure is unusually narrow--and TWU does not claim this--I would assume that the union is required to process contract claims through arbitration during the term of the contract. See Andrews v. Louisville & Nashville R.R. Co., 406 U.S. 320, 325, 92 S.Ct. 1562, 1565-66, 32 L.Ed.2d 95 (1972); Air Line Pilots Ass'n v. Northwest Airlines, Inc., 627 F.2d 272, 275 (D.C.Cir.1980).
 
 
 206
 In other words, the status quo provisions of section 6 may be invoked only in situations where a union is in a position to compel the employer to negotiate changes in the contract. If the parties' contract is for a fixed term and it includes a broad arbitration clause (covering the matter in dispute) or the equivalent of a "zipper clause," see, e.g., International Union, UAW v. NLRB, 765 F.2d 175, 179-80 & n. 21 (D.C.Cir.1985); National Ry. Labor Conference v. International Ass'n of Machinists, 830 F.2d 741, 746 n. 4 (7th Cir.1987) (indicating that the contract there "provided that no change in the agreement would occur prior to July 1, 1984, and no proposal to change the agreement could be served prior to April 1, 1984"), the union cannot avoid the resolution of contract (minor ) disputes through arbitration by simply declaring their dispute to be major. There is a caveat to this rule, however: even when a dispute has been found to be minor, a trial court may exercise equitable power to impose conditions requiring the employer to maintain the status quo, pending resolution of the dispute in arbitration. See National Ry. Labor Conference, 830 F.2d at 750-52. Since TWU has not sought the application of this equitable principle, we need not consider the issue.
 
 
 207
 3. The Disputes Between Eastern and ALPA and IAM: The Status Quo Requirement Where the Agreement Has Expired
 
 
 208
 The foregoing analysis is inapplicable to the disputes between Eastern and ALPA and IAM. In these latter two cases, the parties agree that their collective bargaining agreements expired before this appeal, and that both unions have filed section 6 notices indicating their intention to negotiate changes in the agreements. There is no doubt that, with respect to ALPA and IAM, the parties' disputes are major, and possibly minor as well.
 
 
 209
 In my view, a single set of circumstances may give rise to both major and minor disputes under the RLA, especially in a situation where the parties' collective bargaining agreement has expired.[1] When the agreement has expired, and the union has given "notice" pursuant to section 6, there can be no doubt whatsoever that, so long as the matter pertains to rates of pay, rules or working conditions, the subject of the notice becomes a major dispute under the Act. It is major because it "look[s] to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past." Elgin, Joliet & Eastern Ry. Co. v. Burley, 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886 (1945), aff'd on rehearing, 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928 (1946). It is hardly surprising, therefore, that both the Ninth and Second Circuits have held that the expiration of an agreement coupled with the filing of a section 6 notice results in a major dispute with respect to any matter covered by the notice. International Ass'n of Machinists v. Aloha Airlines, Inc., 776 F.2d 812, 816 (9th Cir.1985); Air Cargo, Inc. v. Local 851, Int'l Brotherhood of Teamsters, 733 F.2d 241, 245-46 (2d Cir.1984). The only problem with the Aloha and Air Cargo decisions is their suggestion that circumstances giving rise to a major dispute cannot also give rise to a minor dispute under the Act. There is simply no support for this proposition.
 
 
 210
 A minor dispute involves a situation in which "the claim is to rights accrued," Elgin, Joliet & Eastern Ry. Co., 325 U.S. at 723, 65 S.Ct. at 1290, and a major dispute "relates to disputes over the formation of collective agreements." Id. Thus, for example, it would be possible for a union to give a section 6 notice pertaining to revised or new layoff provisions to be included in a new collective bargaining agreement, and simultaneously to claim that employees had "accrued" rights under an expired agreement (including a right to arbitrate their grievances) protecting them from layoffs pending negotiation of a new agreement. If, in such a circumstance, the employer acted to lay off employees without the consent of the union, the resulting circumstances would give rise to both major and minor disputes under the Act. With respect to the minor dispute, the matter would be submitted to an arbitration board for a determination whether the employees had any accrued rights emanating from the expired contract. With respect to the major dispute, a court would be required to determine whether the employer had unlawfully altered the status quo in unilaterally acting to lay off bargaining unit employees.
 
 
 211
 In this case, the District Court issued a preliminary injunction on a finding that the employer's unilateral actions in furloughing employees violated the status quo. That finding is not clearly erroneous as to the disputes between Eastern and ALPA and IAM. Therefore, because the disagreements between Eastern and ALPA and IAM involve major disputes under the Act, the judgment of the District Court should not have been disturbed by the panel. It is immaterial that the ALPA and IAM cases also may have involved minor disputes.
 
 
 212
 The panel opinion in this case holds that "[a]s the norms generated by [the parties' past] practice[s] are protected from unilateral change by Sec. 6, they are also available to classify a dispute [as either major or minor]." Supra, at 899. This statement has no comprehensible meaning in the context of this case. In support, the panel cites National Ry. Labor Conference, supra, see supra at 896, but the discussion in that case asserts almost the exact opposite of what is suggested by the panel. Discussing the Supreme Court precedent on the subject, National Ry. Labor Conference notes that the Court's "language [in Detroit & Toledo Shoreline R.R. v. United Transportation Union, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d325 (1969) ] specifically addresses the question of how a court should determine the scope of a status quo injunction in a major dispute, not the question of whether a party may call on past practice in attempting to show that a dispute can (or cannot) be settled by reference to an existing agreement (thus establishing whether the dispute is major or minor).... [A]rguments from past practice may be relevant to the characterization of a dispute as major or minor, but ... they will most often have only a limited impact on the characterization." 830 F.2d at 746-47.
 
 
 213
 Past practices are relevant with respect to bargaining relationships under the RLA, but not in the way suggested by the panel opinion. An arbitration board may look to past practices to determine whether a union has a valid claim of right under a current or expired collective bargaining agreement. And a court may look to past practices in determining whether to grant an injunction for violation of the status quo under section 6. The same practices may even be determinative of both questions. But there is nothing in the Act or in the case law that says past practices must be used to "classify [ ] disputes as major or minor," panel opinion, at 898 (emphasis added), or that a finding of one kind of dispute forecloses the existence of the other.
 
 
 214
 Furthermore, in my view, the panel opinion is plainly wrong in suggesting that, because minor disputes may encompass a claim founded upon some incident of the employment relation independent of those covered by the explicit terms of a collective bargaining agreement, Elgin, Joliet & Eastern Ry. Co., 325 U.S. at 723, 65 S.Ct. at 1290, it somehow follows that all such matters are only minor disputes under the Act. Panel opinion, at 898. This is an extraordinary proposition which, if logically followed, would ravage the notion of major disputes under the Act. To justify its position, the panel opinion relies on a passage from the decision in Elgin, Joliet & Eastern Ry. Co., 325 U.S. at 723, 65 S.Ct. at 1290, that can in no manner be read to support the proposition that is advanced. It is true, as the panel suggests, that minor disputes may arise after the expiration of a collective agreement, but this does not mean that the subject of the minor dispute may not also be the subject of a major dispute under the Act.
 
 
 215
 4. Judge Silberman's Separate Statement Concurring in the Denial of Rehearing En Banc
 
 
 216
 The separate opinion of Judge Silberman appears to recognize these many difficulties with the panel opinion; thus, Judge Silberman rejects much of the rationale of the panel opinion and offers a different line of reasoning in an effort to reach the same result. But this separate statement simply lends more confusion to the problem.
 
 
 217
 As I read his separate statement, Judge Silberman says that the expiration of the parties' agreement does not foreclose a finding of a minor dispute and a remission of the dispute to arbitration for resolution. Judge Silberman also seems to accept the panel's judgment that the disputes in this case are "minor." However, in considering the cases involving Eastern and ALPA and IAM, he argues that an arbitration board may have no jurisdiction to consider the union's claim because there may be no law to apply. Thus, under this view, the union is precluded from seeking relief under section 6 because the dispute is characterized only as a minor one under the Act, and the union is also foreclosed from raising a claim for relief in arbitration because the arbitration board has no "jurisdiction" to hear the case. As can be seen, this proposed resolution of the case would create a legal hiatus between major and minor disputes; I find this solution incomprehensible under the Act.[2]
 
 
 218
 Apart from the hiatus problem, the solution proposed by Judge Silberman is untenable on the present record. First, it cannot be determined, as Judge Silberman suggests, that the unions have failed to raise arbitrable claims. Such a suggestion is utterly gratuitous, because the matter never has been fully litigated by the parties. It also flies in the face of the strong presumption of arbitrability that normally accompanies union grievances of the sort here at issue.
 
 
 219
 Second, in his passing "cf." reference to Flight Eng'rs Int'l Ass'n v. Eastern Air Lines, Inc., 359 F.2d 303, 310-11 (2d Cir.1966), Judge Silberman seems to assume that the expiration of a collective bargaining agreement always will relieve an employer of an obligation to arbitrate grievances arising under an expired contract. This proposition is neither self-evident, see Nolde Bros. v. Local 358, Bakery Workers Union, 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977) (indicating that the obligation to arbitrate does not necessarily terminate with the expiration of the contract), nor is it determinative in the instant case. Flight Eng'rs does say that, on the facts of that case, the expiration of the parties' agreement relieved the employer of an obligation to arbitrate claims arising under the old contract; however, the court did not say that the subject of the parties' disagreement could not be a major dispute under the Act. If anything, the court suggests just the opposite. Indeed, it is not at all unusual for parties in collective bargaining to use the negotiation (major dispute) process to settle unresolved grievances left over from the terms of an expired agreement. In any event, in this case the matter was neither litigated by the parties nor even recognized as an issue by the panel; therefore, it can hardly form the basis for a decision to deny rehearing en banc. The most that can be said about this matter is that it raises yet another very difficult and important issue militating in favor of en banc review.
 
 CONCLUSION
 
 220
 This case presents one of those "rare circumstances" when en banc consideration is essential to secure uniformity of decisions within the circuit, to correct a panel opinion that conflicts with the controlling pronouncements of the Supreme Court, to resolve a potential conflict between this circuit and at least two of our sister circuits, and to decide several issues of exceptional importance with respect to questions that will recur in the future. I believe that we have made an unfortunate mistake in declining to review this case, and I can discern no principled basis for our action.
 
 
 221
 RUTH BADER GINSBURG, Circuit Judge, concurring in the denial of rehearing en banc:
 
 
 222
 "[O]nly in the rarest of circumstances," I continue to believe, should we countenance the drain on judicial resources, the expense and delay for the litigants, and the high risk of a multiplicity of opinions offering no authoritative guidance, that full circuit rehearing of a freshly-decided case entails. See Bartlett v. Bowen, 824 F.2d 1240, 1241, 1244 (D.C.Cir.1987) (Edwards, J., concurring in denials of rehearing en banc ) (stressing need for judges on a circuit to "trust one another and have faith in the work of their colleagues"); Church of Scientology v. Foley, 640 F.2d 1335, 1336, 1341 (D.C.Cir.) (en banc ) (Robinson, J., dissenting opinion) (stressing "need for judicial restraint in invoking the en banc mechanism"), cert. denied, 452 U.S. 961, 101 S.Ct. 3110, 69 L.Ed.2d 972 (1981). Judge Silberman usefully observes that on remand, in the context of litigation concerning permanent injunctive relief, the district court will be positioned to further consider and decide by final judgment "whether Eastern Air Lines would have instituted the operational changes and furloughs absent its anti-union motivations." Because I agree that the panel opinion does not foreclose such dispositive litigation,[1] I do not believe that dissolution of the preliminary injunction qualifies as the rare case in which it is incumbent upon the full court to "sit in judgment on the panel." See Jolly v. Listerman, 675 F.2d 1308, 1311 (D.C.Cir.) (Robinson, C.J., concurring in denial of rehearing en banc ), cert. denied, 459 U.S. 1037, 103 S.Ct. 450, 74 L.Ed.2d 604 (1982).[2]
 
 
 223
 Without full briefing and argument, I am not positioned either to "sanction the result" the panel has reached, id., or to subscribe to the different views of the case taken in dissents from the denial of the suggestion to hear the case en banc. I am persuaded, however, that "reluctance to repair to the en banc procedure" reflects a sound, collegial attitude. But see Starr, J., concurring in the denial of rehearing en banc. That persuasion leads me to decline to vote to rehear this appeal.
 
 
 224
 STARR, Circuit Judge, concurring in the denial of rehearing en banc:
 
 
 225
 The panel's decision in this case creates a clear conflict with the holdings of two of our sister circuits. Under these circumstances, it seems to me that the court has a particularly important responsibility to consider carefully the course on which it is embarking. The reason is not only one of respect for our judicial colleagues elsewhere; equally fundamental is the Supreme Court's manifest lack of capacity to address all significant conflicts of law within the ever growing circuits.
 
 
 226
 With the Supreme Court's plenary docket brim to overflowing, the appellate en banc procedure duly authorized by Congress provides a reasonable and sensible way of assuring that conflicts are not lightly or casually created. This alternative seems all the more applicable to our court, which ranks in the bottom tier of the respective courts of appeals in the percentage of cases that it sees fit to consider en banc. Indeed, our comparative reluctance to repair to the en banc procedure is doubly odd inasmuch as Congress has seen fit to confer exclusive jurisdiction on our court in a number of critical arenas of federal law. Thus, quite apart from conflict-generating decisions (which are of obvious importance to the uniformity of federal decisional law), of equally high concern to our court should be panel decisions raising important issues in the body of administrative law, the area in which our daily labors so completely immerse us. In view of our unique jurisdictional mandate and location at the seat of government, we are well advised to be vigilant in keeping our own house fully in order. In short, one would more naturally think that we would rank toward the top of the circuits, rather than leisurely roosting down near the bottom, in our willingness to take a more considered, second look at the important cases that so regularly come before us.
 
 
 227
 In the case at hand, I have carefully considered the views of the panel, those of my colleagues who take a contrary view, and those of the two circuits which have gone in a different direction. Thus edified, I am firmly persuaded that my colleagues on the panel are, much more likely than not, entirely correct. The panel's reasoning is clear, sensible and reasonable. It treats fully and candidly the contrary views of the other two circuits. Accordingly, being unpersuaded that error has infected the panel's approach, I am content with the full court's decision to allow this circuit's differing interpretation of federal law to stand. The conflict is regrettable, but it nonetheless represents the considered and, I tend to believe, correct judgment of those charged with interpreting federal law. Above all, the decision resulting in a circuit conflict is one that has been made soberly and conscientiously, respectful of contrary views elsewhere, which is all that reasonably can be asked of us.
 
 
 228
 SILBERMAN, Circuit Judge, concurring in the denial of rehearing en banc:
 
 
 229
 I concur in the denial of rehearing en banc, but wish to set forth my understanding of the scope of the issues both that may yet be litigated by the plaintiffs seeking a permanent injunction and that may be presented to the System Board.
 
 
 230
 As I read the panel opinion, the district court on remand is free to take testimony and otherwise further develop the factual record for purposes of applying the dual motivation principles of Wright Line, 251 N.L.R.B. 1083 (1980), enf't granted, NLRB v. Wright Line, 662 F.2d 899 (1st Cir.1981), cert. denied, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), to the disputed employee furloughs. In other words, I do not read the panel opinion to foreclose further litigation over whether Eastern Air Lines would have instituted the operational changes and furloughs absent its anti-union motivations. See panel opinion, at 913. ("we remand the claims under Sec. 2 to the district court so that it may receive such evidence and entertain such claims for permanent injunctive relief as plaintiffs may choose to present."). On reviewing the district court's opinion, I confess some doubt as to whether the district court actually found that "financial reasons constituted an independent and sufficient motive for the [challenged] cutbacks" (although the evidence presented so far would seem to support such a finding). Supra, at 903. Nevertheless, because the panel opinion, in my view, does not purport finally to decide this question, the proper construction of the district court's original findings is of little moment.
 
 
 231
 Similarly, with respect to the dispute between Eastern and the Transport Workers Union ("TWU"), I do not think the panel opinion should be read as obliging the System Board, in the event the union seeks arbitration of the parties' "minor" dispute, to conclude that the furloughs are authorized by the agreement in force. The holding on that point is merely that "the record compels a finding that Eastern's proposal was covered by the collective bargaining agreement and the course of dealing between the company and TWU," supra at 898 (emphasis added), thus leaving the issue of whether the agreement actually authorized the furloughs to the System Board. I gather Judge Edwards agrees with me in this respect.
 
 
 232
 As to whether the dispute between Eastern and the unions with expired agreements is major or minor under the RLA, I, like the panel, do not believe our sister circuits correct in assuming that the expiration of the collective agreement together with the service of a section 6 notice renders all disputes between union and employer major under the Act. See International Ass'n of Machinists & Aerospace Workers v. Aloha Airlines, 776 F.2d 812 (9th Cir.1985); Air Cargo Inc. v. Local 851, Int'l Bhd. of Teamsters, 733 F.2d 241, 245-46 (2d Cir.1984). As the panel observed, the Supreme Court's decision in Elgin, Joliet & Eastern Ry. Co. v. Burley makes plain that off-the-contract disputes founded on entitlements "independent of those covered by the collective agreement," 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886 (1945), may be taken to the RLA's apparatus for settlement of minor disputes--the System Board--and there is no sound reason why expiration of the collective agreement should occasion a different route for these disputes. Indeed, in another case heard only a month ago,[1] the Air Line Pilots Association ("ALPA"), one of the petitioning unions here, implicitly argued against the views expressed by the Ninth Circuit--that once a contract expires (and a section 6 notice is given) all disputes are major. Thus, while we should surely pause before we create a conflict between the circuits, especially in the instant setting where divergent rules may prompt parties to forum-shop, the Aloha reasoning seems to me to be wrong.[2]
 
 
 233
 Nevertheless, I think the rule drawn by the panel--that the minor or major character of a dispute in the post-expiration context is governed largely by whether the disputed action is consistent with the parties' "settled past practices" under the expired agreement--is problematic as well. While Burley establishes the propriety of System Board adjudication of disputes not involving the interpretation of provisions of a collective agreement, it clearly confines System Board jurisdiction to claims concerning "rights accrued." Id. In other words, only if the System Board has law to apply--be it a formal agreement, enduring understandings between employer and union, or even state tort law principles--can the dispute properly be termed minor. Here, the agreements between Eastern and ALPA and the International Association of Machinists ("Machinists") have expired, and while "settled past practice" may be used to interpret contract terms much as legislative history is used to interpret statutes, or may be relevant in determining whether a party's action deviates from the status quo, ordinarily, by itself, past practice is unlikely to constitute a legal norm of sufficient force to create an entitlement. Cf. Flight Eng. Int'l Ass'n v. Eastern Air Lines, 359 F.2d 303, 310-11 (2d Cir.1966) (holding that expiration of agreement releases employer from obligation to submit to System Board otherwise minor disputes turning on provisions of extinct agreement); but see Nolde Bros. v. Local 358, Bakery Workers Union, 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977) (holding that duty to arbitrate exists with respect to entitlements based on and surviving expired agreement). According virtually no weight to the fact that the labor agreement has expired appears out-of-step with Burley, much as the Aloha rule affronts Burley for different reasons. I therefore doubt that the panel's characterization of the dispute between Eastern and the Airline Pilots and Machinists as minor is correct. Under the panel opinion, however, I see no reason why those unions would not have a right to seek arbitration of the issue by the System Board just as do the Transport Workers.[3]
 
 
 234
 Even assuming the dispute is major, I believe the panel's conclusion that the challenged furloughs were consistent with the parties' expired agreements and practices under those agreements to be justifiable. See panel opinion at 899-900. As the panel held in the first iteration of its opinion, this makes an injunction for violation of the status quo under section 6 of the Act unavailable to the union (although, given the theory of the panel's revised opinion, it does not decide necessarily the merits of a subsequent proceeding before the System Board).
 
 
 235
 As I understand the Railway Labor Act, unlike Gaul, all bargaining disputes are divided into two parts, major or minor, with entirely different procedures provided for the resolution of each. The System Board has primary jurisdiction (indeed given the limited standard of judicial review of the Board, almost exclusive jurisdiction) to resolve the latter, and the former are reserved to collective bargaining, with the federal judiciary empowered only to prevent changes in the status quo before the collective bargaining procedures are exhausted. If a union claims that a given employer's action deprives employees of an entitlement, the dispute is minor because the union alleges that the employer has violated a legal norm presently governing the relationship between the employer and its employees. That dispute must be resolved through System Board arbitration. It is called minor presumably because the parties have already agreed on the appropriate legal norm and the only question to be decided is whether the employer's action comports with that norm.
 
 
 236
 After a contract expires and section 6 notices are given, the parties are assumed to be engaged in bargaining to create a new legal norm through a new collective bargaining agreement. During this period, the employer may not unilaterally impose a change in wages, hours or working conditions--a change in the status quo--until the statutory procedures are exhausted. That is not because the status quo is itself a legal norm, for if it were, major and minor dispute concepts would merge. Rather, it is because a unilateral change in the status quo undermines the bargaining process. The structure of the statute makes clear to me, and all courts to date have apparently assumed, that if the employer's action is constrained--even after expiration of the agreement--by a legal norm arising out of the bargaining relationship, there is no need to consider whether the employer has improperly changed the status quo. In other words, a claimed violation of a legal norm (a minor dispute) trumps a claim of a unilateral change in the status quo (during a major dispute). The statute's bar to a change in the status quo, which is only in effect during the pendency of section 6 bargaining, should not be applied to employer action which deprives employees of a legal entitlement, for the challenged action is independently forbidden.
 
 
 237
 As such, I do not see how a given dispute can be, as Judge Edwards suggests, both major and minor at the same time, for the premises behind the twin assertions of the existence of major and minor disputes are fundamentally inconsistent. Moreover, I think Judge Edwards' approach implies a hopeless intermixture of jurisdictional lines between tribunals and is thus unworkable.[4]
 
 
 238
 Even though I differ somewhat with the panel, I do not vote for the en banc petition for several reasons. First, the case comes to us on a grant of a motion for preliminary injunction and, insofar as the panel might have misunderstood the district judge's "finding" as to the business purpose for the company's action, the judge is free to take further evidence and clarify the application of Wright Line, as the panel indicated. Second, even if the panel is incorrect in treating as minor the bargaining dispute between Eastern and the two unions whose contracts have expired, the panel's original resolution of the status quo issue seems to me to apply the correct law. Therefore, an injunction would not be available in any event (although the panel's holding that the disputes are minor appears to give the unions an arbitration remedy). In any event, given the multiplicity of views accompanying this order, I doubt whether we could easily assemble a majority for any coherent en banc holding in the case.
 
 
 239
 STEPHEN F. WILLIAMS, Circuit Judge, concurring in the denial of en banc:
 
 
 240
 Without repeating the analysis contained in the panel opinion, I will try to suggest why the case is inappropriate for en banc treatment.
 
 
 241
 1. Classification of the IAM and ALPA disputes as major or minor. Judge Edwards urges en banc consideration on the basis of a contention not urged by any party to the lawsuit, namely, that a single dispute arising on the expiration of a collective bargaining agreement may be classified as both minor and major, with the result that "the matter" would be "submitted to an arbitration board for a determination whether the employees had any accrued rights emanating from the expired contract," and to a court "to determine whether the employer had unlawfully altered the status quo." Statement of Judge Edwards at 923.
 
 
 242
 I take no position on the merits of Judge Edwards's proposal. On the one hand, prior judicial decisions appear to have assumed that a dispute was one or the other, but not both. Elgin, Joliet & Eastern Ry. Co. v. Burley, 325 U.S. 711, 722, 65 S.Ct. 1282, 1289, 89 L.Ed. 1886 (1945), for example, asserts that the "two sorts of dispute are sharply distinguished." The opinion goes on to note that "Congress has drawn major lines of differences between the two classes of controversy." Id. at 723, 65 S.Ct. at 1290; see also Union Pac. R.R. Co. v. Sheehan, 439 U.S. 89, 94, 99 S.Ct. 399, 402, 58 L.Ed.2d 354 (1978) ("Congress considered it essential to keep these so-called 'minor' disputes within the Adjustment Board and out of the courts."); Railway Labor Executives Ass'n v. Norfolk & Western Ry., 833 F.2d 700, 704 (7th Cir.1987) (Adjustment Board's jurisdiction over minor disputes is exclusive). Moreover, the parties all argued the case on that premise, none of them suggesting a two-track solution to the present controversy. Finally, the proposed solution would seem to give the complaining party two bites at what is, despite the existence of two conceptual strands, essentially one substantive apple--a claim that the disputed conduct violates a temporary entitlement grounded in past practice.
 
 
 243
 On the other hand, where a collective bargaining agreement has expired, it is certainly an awkward task to determine whether a party's claims constitute an assertion of accrued rights under so much of the contract as persists despite its expiration (i.e., minor in the view of both the panel and Judge Edwards), or, alternatively, an unlawful violation of the status quo (i.e., major in the view of both the panel and Judge Edwards). In a future case, some party may well wish to advance Judge Edwards's solution.
 
 
 244
 Returning, however, to the immediate issue: The panel opinion simply takes no position on the possibility that in the post-expiration period a party's conduct may entail both a major and a minor dispute. It merely adopted the premise of the parties that it must be one or the other. It seems to me inappropriate to incur all the burdens of an en banc hearing to consider a theory not contradicted by the panel and not advanced by any party.
 
 
 245
 I am not sure precisely what solution Judge Mikva offers for the puzzle of classifying post-expiration disputes. See Statement of Judge Mikva at 918-919. Insofar as he suggests that the panel opinion precludes post-expiration injunctions to protect the status quo, id. at 918 (referring to "courts issu[ing] injunctions to prevent the alteration of" objective working conditions, and saying that the "panel rejects this doctrine"), he misconceives the opinion.[1] The opinion sought to preserve the congressionally intended two tracks into the post-expiration phase, including injunctive relief in major disputes "that raise broader issues likely in themselves to engender a strike." See panel opinion at 899.
 
 
 246
 The present case seems to offer the maximum likelihood that an en banc would merely aggravate whatever deficiencies prevail in circuit law: the proponents of the en banc disagree radically on the solution, one tenders a proposal that is not so much as hinted at by any of the parties, and one offers a critique based on a clear misconception of the panel opinion. See Statement of Judge Ruth B. Ginsburg at 925 n. 2 (doubting utility of en banc under these circumstances).[2]
 
 
 247
 2. Application of Wright Line: Judge Mikva argues that the panel should not have applied the Wright Line test but rather one that he discerns in Air Line Pilots Ass'n v. United Air Lines, Inc., 802 F.2d 886 (7th Cir.1986), cert. denied, 480 U.S. 946, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987). I gather from his citation that Judge Mikva would hold that any action taken with a mixed motive violates the RLA because "[a]nti-union motivation invalidates even a discharge which could be justified on independent grounds." Statement of Judge Mikva at 917 (citing Air Line Pilots Ass'n, 802 F.2d at 900).
 
 
 248
 Of course, a simple answer to this argument is that neither the court in Air Line Pilots, nor the decision that it quotes, Conrad v. Delta Air Lines, Inc., 494 F.2d 914, 918 (7th Cir.1974), considered whether the Wright Line test was applicable. (Indeed, such a consideration would have been impossible in Conrad as it pre-dates both Wright Line and NLRB v. Transportation Management Corp.) Moreover, the facts of Air Line Pilots appear to be such that, under the legal scheme of which Wright Line is a component, the airline's conduct would be unlawful because of its explicit discrimination.
 
 
 249
 In Air Line Pilots the union and the airline had been involved in negotiations under the dispute resolution procedures appropriate for major disputes. 802 F.2d at 893. After the National Mediation Board declared an impasse, the union went on strike against United. In response to the strike, United embarked on a complicated scheme of self-help, one portion of which was the subject of the language quoted by Judge Mikva. United cancelled its pilot assignments for all pilots, striking and nonstriking, thereby creating vacancies in every pilot position. Nonstriking pilots who reported to work before a certain deadline were allowed to bid on the vast majority of the vacancies; thus "nonstriking pilots were able to leapfrog over more senior striking pilots." Id. The court was asked to determine if the rebid system violated the RLA.
 
 
 250
 As the scheme explicitly discriminated on the basis of the pilots' exercise of protected rights, it was the sort of conduct that is viewed as "inherently destructive" and therefore ineligible for Wright Line analysis. See panel opinion at 902 (citing NLRB v. Great Dane Trailers, 388 U.S. 26, 34, 87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027 (1967), and listing other examples of discriminatory, inherently destructive behavior). As there is no dispute that Wright Line is not the appropriate test in such situations, it is hardly surprising that the Seventh Circuit did not discuss it. Here, by contrast, it is beyond dispute that the furlough implemented by Eastern in no way discriminated against union members. See panel opinion at 903.[3]
 
 
 251
 Finally, Air Line Pilots' analysis of the RLA issues was influenced heavily by a landmark NLRA precedent dealing with inherently destructive behavior on the part of employers, NLRB v. Erie Resistor Corp., 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963). The court's use of Erie Resistor obviously reflects its view that NLRA precedents can be useful in the context of RLA disputes, a view that the panel shared, see supra at 901-903, 911-913, and that Judge Mikva rejects, see Statement of Judge Mikva at 917-918.
 
 
 252
 I am puzzled by Judge Mikva's view, evidently shared by Judge Edwards, that Wright Line is inappropriate in the context of large-scale furloughs and changes in business operations, as opposed to single-employee discharges. In an opinion by Judge Edwards, Teamsters Local Union No. 171 v. NLRB, 863 F.2d 946, 955-957 (D.C.Cir.1988), this court applied Wright Line to a firm's relocation of a trucking depot, and its concomitant shift of 7.5% of its total work force to a new location and dismissal of another 6%.[4] These percentages are somewhat smaller than were involved in Eastern's September cutbacks, but the employer defended them not on the basis of employee fault but rather by asserting the sort of business justification invoked here by Eastern. Moreover, it is hard to see why the differences in percentages could alter the appropriate rule.
 
 
 253
 I am also unable to grasp Judge Mikva's statement that the panel's Wright Line analysis means that "so long as the proposals of the employer will save money, anything goes." Statement of Judge Mikva at 917. Precisely out of concern for such a consequence, the panel explicitly declined to apply Wright Line in the work transfer context, where its use might have had that effect. See supra at 907-908.
 
 
 254
 3. Factual disputes. It seems to me it would be a rare case where a panel's reversal of a district court on the facts under Rule 52(a)'s "clearly erroneous" provision would be suitable for an en banc disposition. While I cannot without undue repetition of the panel opinion respond to every suggestion by Judge Mikva, a few points are in order:
 
 
 255
 a. Judge Mikva suggests that the court "discounts the numerous instances of work transfer" from Eastern to Continental. Statement of Judge Mikva at 915. As with the famous question, "Have you stopped beating your wife," the assertion builds in a false premise.
 
 
 256
 There were no "instances of work transfer," with the possible exception of the Miami-London route, the irrelevance of which is explained at pp. 906-907 of the panel opinion. Judge Mikva may prefer the generalizations of the district court, but his suggestion that the panel's detailed analysis of the record, supra at 903-908 "miss[ed] the forest for the trees," is a poor substitute for finding a flaw in that analysis. The metaphor is also inapt. This was a case of no trees, no forest.
 
 
 257
 b. Judge Mikva refers at 918 to the furlough as "the largest furlough in Eastern's history." This is unsupported and, by some measurements, refuted by the record. For example, the 1050 flight attendants furloughed are clearly fewer than the 1102 furloughed in February 1986. Appellants' Appendix II-417. The 1172 IAM members furloughed are fewer than the 1384 furloughed in 1983 and the 1429 furloughed in 1987. See id. at II-418. (As to the latter, the relation is ambiguous, as furloughing evidently was split into two separate events in those years. See id.)
 
 
 258
 One useful measure of scale, which the panel cited, was the reduction in aircraft hours. This was 15.4% for the September cutbacks, as against 14% for a 1981 cutback and five previous cutbacks of more than 10%. See panel opinion at 898.
 
 
 259
 Endless reiteration of adjectives ("massive," Statement of Judge Mikva at 916, "mammoth," id. at 917, "large-scale," id. at 914, 915, 917) cannot override the raw facts in the record. If the September cutbacks were "mammoth," then Eastern since 1980 has seen the passage of a veritable herd of mammoths.
 
 
 260
 c. Judge Mikva notes that as he was not an original member of the panel, he is "not in a position to judge for myself what the facts really are." Statement of Judge Mikva at 915. Without his tackling the record, the point is indisputable. He goes on, however, to proclaim that he knows which court was in the best position to decide, id., from which knowledge he believes (I take it) that he may discard the panel's factual analysis solely on the basis of citing conclusory assertions of the district court. But Rule 52(a)'s provision for reversal of district court fact findings where "clearly erroneous" plainly assumes that a district court may err, and may even err so plainly that the court of appeals should reverse. To decide whether a case belongs to the latter category, there is no substitute for studying the record.
 
 
 261
 Judge Mikva also manages to put aside his diffidence about the state of the record when he suggests that the panel "apparently thought that justice required it to allow Eastern's management to extricate itself from a financial morass largely of its own making," and that "to achieve that result, the panel has rushed headlong" into various complexities and alleged errors. Statement of Judge Mikva at 914. I can see no place for charges of "result orientation" in judicial opinions. Such thoughts are best left to our ultimate judges at the bar and in the academy, as they evaluate the analytical force of our opinions and assess any patterns they may detect in our decisions. Such expressions contribute nothing to anyone's cognitive grasp of the issues and less to the collegiality of judges.
 
 CONCLUSION
 
 262
 1. The classification of disputes as major or minor where the agreement has expired is certainly vexing, and no one can safely be dogmatic on the subject. As Judge Silberman points out in his separate statement, however, the expired agreements and past practices were such that the opposite decision on the point would not have changed the outcome. See Statement of Judge Silberman at 927, 928; see also panel opinion at 898-900 (finding that even if the dispute were considered to be major, furlough was not a violation of the status quo and district court could not properly issue an injunction to block implementation).
 
 
 263
 2. As to any continuing dispute between the parties over factual matters, the panel explicitly left the plaintiffs free to introduce further evidence in support of any request for permanent relief that they may choose to make. Supra at 913.
 
 
 
 *
 See note 3
 
 
 [1]
 A "hub" is a scheduling and marketing concept which describes a city where a large number of an airline's flights originate and terminate
 
 
 [2]
 Since 1936, the Railway Labor Act has governed the relationship between an airline and its workers. 45 U.S.C. Secs. 181-87 (1987)
 
 
 [3]
 In dissolving the injunction unconditionally on September 30, we issued a typed and photocopied opinion to explain to the parties why we were not requiring further security. The present opinion is substantially the same; the primary change is that whereas on September 30 we left open whether the disputes between Eastern and ALPA and IAM were "major" or "minor" under the RLA, we now find that they were minor. See pages 898-900 below. In addition, the discussion of general anti-union animus is somewhat amplified. See pages 911-913 below. All changes between the two opinions are identified in an order of the court issued with the printed opinion
 
 
 [4]
 Sec. 6 in its entirety reads:
 Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice. In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board.
 
 
 [5]
 Sec. 2 Third in its entirety reads:
 Representatives, for the purposes of this chapter, shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives. Representatives of employees for the purposes of this chapter need not be persons in the employ of the carrier, and no carrier shall, by interference, influence, or coercion seek in any manner to prevent the designation by its employees as their representatives of those who or which are not employees of the carrier.
 
 
 [6]
 Sec. 2 Fourth in its entirety reads:
 Employees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter. No carrier, its officers or agents, shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining, or in performing any work therefor, or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization, or to deduct from the wages of employees any dues, fees, assessments, or other contributions payable to labor organizations, or to collect or to assist in the collection of any such dues, fees, assessments, or other contributions: Provided, that nothing in this chapter shall be construed to prohibit a carrier from permitting an employee, individually, or local representatives of employees from conferring with management during working hours without loss of time, or to prohibit a carrier from furnishing free transportation to its employees while engaged in the business of a labor organization.
 
 
 *
 Circuit Judge D.H. Ginsburg did not participate in this order
 
 
 [1]
 I do not assert, as Judge Silberman erroneously states, that "a given dispute can be ... both major and minor at the same time." (Emphasis added.) Rather, I maintain that major and minor disputes can coexist under the Act, supra, p. 921, and that "a single set of circumstances may give rise to both major and minor disputes under the RLA." These premises are not at all "fundamentally inconsistent," nor do they imply a "hopeless intermixture of jurisdictional lines," as Judge Silberman seems to think
 
 
 [2]
 Judge Silberman suggests that I have misread his position. If this is so, then I am comforted in knowing that he, too, would be disquieted by a conclusion suggesting that the Eastern and ALPA and IAM cases involve neither "major" nor "minor" disputes. If I have misunderstood Judge Silberman's position on this point, it may be because it is unclear from his opinion how he intends to characterize the Eastern and ALPA and IAM disputes
 
 
 [1]
 Although I do not reach any of the further matters Judge Silberman addresses, I share his doubt that "the district court actually found that 'financial reasons constituted an independent and sufficient motive for the [challenged] cutbacks' "; on remand, the district judge can state precisely what he finds from the evidence on that score
 
 
 [2]
 My colleagues' clear previews of their diverse positions, moreover, lead me to doubt whether en banc rehearing in this case at this juncture would in fact "secure uniformity of decisions in this circuit" or yield a more stable resolution of exceptionally important matters. But see Edwards, J., dissenting from the denial of rehearing en banc, at 920, 924
 
 
 [1]
 Air Line Pilots Ass'n, Int'l, et al. v. Delta Air Lines, Inc., 863 F.2d 87, 91 n. 2 (D.C.Cir.1988)
 
 
 [2]
 Judge Edwards and Judge Starr make a valid point in suggesting that an inter-circuit conflict is ordinarily an important factor to consider in determining whether a case is en banc -worthy; typically, such a conflict will have a significant correlative impact on this circuit. See Bartlett v. Bowen, 824 F.2d 1240, 1246 (D.C.Cir.1987) (Silberman, J., concurring in the denial of rehearing en banc )
 
 
 [3]
 I am perplexed by Judge Edwards' rather obvious misreading of my position. I have absolutely no idea what is the "hiatus" to which he refers nor do I understand his reference to the union's "failure" to raise arbitrable claims. As I understand the panel opinion, all three unions may now raise arbitrable claims
 
 
 [4]
 It is analytically possible for employer actions during a major dispute to give rise to one or more minor disputes, but the same facts cannot create or constitute both major and minor disputes
 
 
 [1]
 A technicality: In neither IAM v. Aloha Airlines, Inc., 776 F.2d 812 (9th Cir.1985), nor Air Cargo, Inc. v. Local Union 851, 733 F.2d 241 (2d Cir.1984), did the injunction issue. The courts of appeals remanded for the district courts to determine whether there was a violation of the status quo
 
 
 [2]
 I assume that Judge Mikva is not claiming to overrule unilaterally the rule that panel opinions are circuit law unless overturned by an en banc court or by the Supreme Court, see, e.g., Brewster v. Commissioner of Internal Revenue, 607 F.2d 1369, 1373 (D.C.Cir.), cert. denied, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979), when he observes that the panel opinion "cannot serve as any significant guidepost in this circuit on these difficult and unsettled areas of law," Statement of Judge Mikva at 919
 
 
 [3]
 In Air Line Pilots, moreover, there was no serious claim of any business justification at all. See, e.g., 802 F.2d at 899 ("United does not contest the district court's conclusion that the rebid was not necessary to ensure the continuation of the airline's operations during the short-lived strike"); id. (finding it "at least arguable that the rebid was devoid of any business justification whatsoever"); id. ("United's actions with respect to the rebid were taken more out of spite for ALPA than in hopes of rebuilding the airline"); id. ("when ... the rebid plan [was presented] to a meeting of the airline's corporate officers, no business justification was given for the plan")
 
 
 [4]
 See Brief for the A.G. Boone Co. 2 (company employs 78 people in Charlotte, N.C.); Joint Appendix 247 (testimony of company president that 25 drivers were employed in Anderson/Simpsonville, S.C.); Brief for the National Labor Relations Board 11 (16 employees in Montvale before the transfer); id. at 31 (7 Montvale employees laid off in August)